UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| EXODUS REFUGEE IMMIGRATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15-cv-1858-TWP-DKL |
| | ) | |
| MIKE PENCE, in his official capacity as | ) | |
| Governor of the State of Indiana, | ) | |
| JOHN WERNERT, M.D, in his official capacity | ) | |
| as the Secretary of the Indiana Family and Social | ) | |
| Services Administration, | ) | |
| | ) | |
| Defendants. | ) | |

## Memorandum in Support of Motion for Preliminary Injunction

### Introduction

The decision as to the admission of refugees and their resettlement is exclusively that of the federal government.  Nevertheless, Governor Mike Pence has presumed to direct all state agencies to suspend the resettlement of Syrian refugees in Indiana.  Among other things, this means that the office within the Indiana Family and Social Services Administration that receives federal funding to be passed through to refugees and the local agencies that work with them will suspend its assistance as will other state agencies.  Not only is the Governor's action clearly preempted by the Constitution and federal law, but it explicitly violates the prohibition in Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, on national-origin discrimination.  It also fails the strict scrutiny demanded by equal protection.

Exodus Refugee Immigration ("Exodus") is an Indianapolis-based not-for-profit agency that receives refugees and assists in their resettlement efforts.  It has contracts with the federal government and the State of Indiana to do so and it and the refugees it works with depend on

federal funds "passed through" the State of Indiana to provide essential services to the refugees. Indeed, Exodus had already expended unreimbursed resources to help one Syrian family to settle in Indiana when the family was forced by the State's unlawful policy to be turned away from the new home that Exodus had prepared and was instead diverted to another state.  In preventing this Syrian family and others from being resettled by Exodus, the State is interfering with Exodus's core mission of resetting refugee families in compliance with federal law, and depriving the refugee families whom Exodus serves of essential benefits and services.  This is an ongoing harm as Exodus has been notified that there are currently 19 refugees from Syria who have been approved for placement by the federal government and who will be sent to the Indianapolis area for Exodus to work with and resettle. Because of the State's policy, Exodus and the refugees it serves will be deprived of federal funds that the State has committed to pass through, Exodus will have to divert necessary resources from other projects to assist these Syrian refugees, its core mission and purpose are frustrated, and its organizational interests are permanently damaged.

The actions of the Governor and the Family and Social Services Administration are unconstitutional and unlawful and their attempt to insinuate themselves into the immigration and refugee policies of the United States is clearly preempted.  Appropriate declaratory and injunctive relief must issue to stave off the certain and irreparable harm that will occur if the Governor, and the State's agencies, are allowed to suspend the resettlement of refugees in the State of Indiana.

**The preliminary injunction standard**

The standard in the Seventh Circuit for the granting of a preliminary injunction is clear. In order to determine whether a preliminary injunction should be granted, the Court weighs

several factors:

> (1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

> (2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

> (3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

> (4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).  The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it."  *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984).

**Legal and factual background**

It is believed that the following will be demonstrated at the preliminary injunction hearing in this matter.[1]

### A.    Legal background to refugee resettlement and the Immigration and Nationality Act

The United States Constitution leaves to the federal government the exclusive authority to establish immigration policy and regulate immigration.  This authority "derives from various sources, including the Federal Government's power '[t]o establish [a] uniform Rule of Naturalization,' its power '[t]o regulate Commerce with foreign nations,' and its broad authority over foreign affairs."  *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (citations omitted) (alterations in original).  Pursuant to this authority Congress has enacted a detailed statutory scheme to regulate

---

[1]    Given that discovery has not yet been done in this case, the plaintiff reserves its right to supplement these facts as appropriate.

immigration—the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*—which empowers various federal agencies to enforce and administer immigration law.  The original INA was amended by the Refugee Act of 1980, Pub. L. No. 96-21, to detail the policies and procedures for the admission and resettlement of refugees in the United States.  These statutory provisions are set out at 8 U.S.C. § 1157, *et seq.*  For purposes of federal law, the term "refugee" is defined as:

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1158(b)(1).  Spouses and children of the refugees generally have the same admission status as that of refugees.  8 U.S.C. § 1157(c)(2).

The INA provides that the number of refugees annually shall generally be "such number as the President determines, before the beginning of the fiscal year and after appropriate consultations, is justified by humanitarian concerns or is otherwise in the national interest."  8 U.S.C. § 1157(a)(2).  Admissions under the above "subsection shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after appropriate consultation."  8 U.S.C. § 1157(a)(3).  But, the INA also gives to the President the ability to increase the number of refugees admitted for humanitarian concerns:

> If the President determines, after appropriate consultation, that (1) an unforeseen emergency refugee situation exists, (2) the admission of certain refugees in response to the emergency refugee situation is justified by grave humanitarian concerns or is otherwise in the national interest, and (3) the admission to the United State of these refugees cannot be accomplished under subsection (a) of this section, the President may fix a number of refugees to be admitted to the United States during the succeeding period (not to exceed twelve months) in response to the emergency refugee situation and such admissions shall be allocated among refugees of special humanitarian concern to the United States in accordance with a determination made by the President after the appropriate consultation provided

under this subsection.

8 U.S.C. § 1157(b).  The President of the United States, pursuant to the powers given to him by the INA, has determined, after appropriate consultations with Congress, that "[t]he admission of up to 85,000 refugees to the United States during Fiscal Year (FY) 2016 is justified by humanitarian concerns or is otherwise in the national interest."  White House, *Presidential Determination – Presidential Determination on Refugee Admissions for Fiscal Year 2016*, *at* https://www.whitehouse.gov/the-press-office/2015/09/29/presidential-determination-presidential-determination-refugee-admissions (last visited Dec. 2, 2015).[2]  He has recently announced that the United States will increase the number of Syrian refuges admitted to the United States to at least 10,000 in fiscal year 2016, a more than six-fold increase over the number of refugees from Syria admitted in fiscal year 2015.  *See, e.g.*, Julia Edwards, Reuters, *U.S. to accept 10,000 Syrian refugees: White House*, Sept. 11, 2015, *at* http://www.reuters.com/article/2015/09/11/us-europe-migrants-whitehouse-idUSKCN0RA26220150911#pVD0DJx9tCc2vop0.97 (last visited Dec. 2, 2015).

Within the United States Department of State, the Bureau of Population, Refugees, and Migration works with displaced persons and maintains a program to resettle refugees in the United States.  U.S. Department of State, *Refugee Admissions*, *at* http://www.state.gov/j/prm/ra/index.htm (last visited Dec. 2, 2015).  Located within the U.S. Department of Health and Human Services is the Office of Refugee Resettlement that is charged with the responsibility of funding and administering, in consultation with the Secretary of State, programs to aid refugee resettlement. 8 U.S.C. § 1521.  This office administers and disburses federal funds to states, voluntary agencies, and refugees for assistance in resettlement within the

---

[2]     This Court may, of course, take judicial notice of public records such as this.  *See, e.g.*, *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997) (citing numerous cases).

United States. 8 U.S.C. § 1522.

States receive grants directly from the Office of Refugee Resettlement to provide for medical screening and initial medical treatment of refugees, as well as their educational needs. 8 U.S.C. § 1522(a)(4)(B)(i); § 1522(d)(1).  They also receive grants for monies that are passed through to nonprofit agencies to assist refugees in obtaining self-sufficiency and job-preparation skills, to provide English training if necessary, and to provide other services. 8 U.S.C. § 1522(a)(4)(B)(ii), (iii).  Additionally, refugees and their families are eligible for cash assistance and medical assistance that is to be paid by the states and reimbursed 100% by the federal government. 8 U.S.C. § 1522(e).  In order to receive these monies, a state must submit and have approved a state plan that meets the requirements imposed by the INA. 45 C.F.R. § 400.4. Among other things, the state plan must describe how it "will coordinate cash and medical assistance with support services to ensure their successful use to encourage effective refugee resettlement and to promote employment and economic self-sufficiency as quickly as possible." 45 C.F.R. § 400.5(b).  The plan is also to designate a State Coordinator for the plan and a state agency or agencies responsible for the plan. 45 C.F.R. § 400.5(a),(d).

The INA does not allow a State to veto placement of a refugee within the State but does provide that federal authorities:

to the extent practicable and except under  . . . unusual circumstances, shall –

(i)      insure that a refugee is not initially placed or resettled in an area highly impacted (as determined under regulations prescribed by the Director after consultation with such agencies and governments) by the presence of refugees or comparable populations unless the refugee has a spouse, parent, sibling, son, or daughter residing in that area,

(ii)      provide for a mechanism whereby representatives of local affiliates of voluntary agencies regularly (not less often than quarterly) meet with representatives of State and local governments to plan and coordinate in advance of their arrival the appropriate placement of refugees among the various States

and localities, and

(iii)     take into account—

(I)     the proportion of refugees and comparable entrants in the population in the area,

(II)     the availability of employment opportunities, affordable housing, and public and private resources (including educational, health care, and mental health services) for refugees in the area,

(III)     the likelihood of refugees placed in the area becoming self-sufficient and free from long-term dependence on public assistance, and

(IV)     the secondary migration of refugees to and from the area that is likely to occur.

8 U.S.C. § 1522(a)(2)(C).  Additionally, the INA provides that:

With respect to the location of placement of refugees within a State, the Federal agency administering subsection (b)(1) of this section shall, consistent with such policies and strategies and to the maximum extent possible, take into account recommendations of the State.

8 U.S.C. § 1522(a)(2)(D).  The INA further specifies that assistance to "shall be provided to refugees without regard to race, religion, nationality, sex or political opinion."  8 U.S.C. § 1522(a)(5).  This requirement is also made an explicit part of the state plan requirements imposed by regulation under the INA.  45 C.F.R. § 400.5(g).

**B.     The resettlement of refugees in the United States**

As noted, the United States State Department's Bureau for Populations, Refugees and Migration ("PRM") is the federal office that determines that refugees may be admitted to the United States. (Declaration of Carleen Miller and Cole Varga ("Miller-Varga") ¶ 9, Attached to this memorandum as Exhibit 1).  PRM, in turn, works with nine national organizations, known as Voluntary Agencies—that have cooperative agreements with PRM to provide reception and placement services for approved refugees.  (*Id.* ¶ 10). The approval process is a lengthy one—

generally taking at least 18 months to two years before the refugee is allowed to come to the United States. (*Id.* ¶ 12; *see also, e.g.*, Haeyoun Park & Larry Buchanan, N.Y. Times, *Why It Takes Two Years for Syrian Refugees to Enter the U.S.*, Nov. 20, 2015, *at* http://www.nytimes.com/interactive/2015/11/20/us/why-it-takes-two-years-for-syrian-refugees-to-apply-to-enter-the-united-states.html?_r=0 (last visited Dec. 2, 2015).

Once a refugee is approved for resettlement in the United States the Voluntary Agencies will meet and review information and records of the refugees and determine where the federally-approved refugees will be resettled.  (Miller-Varga ¶ 13).  After this decision is made contact will be made with local agencies that have been approved to work with the refugees in their new communities.  (*Id.* ¶ 14).  The refugees have lawful admission status and they are eligible to become permanent residents and eventually citizens of the United States. (*Id.*  ¶ 15).

Before the refugees arrive the local agencies will do necessary work to prepare for their arrival, including obtaining a place for the refugee to live and performing case management services.  (*Id.* ¶ 16).  The agency will receive a set amount for each refugee to assist in paying for these efforts.  (*Id.* ¶ 17).  This money comes from the PRM's Reception and Placement Program. (*Id.*).  Once the refugees arrive they are entitled to federal monies passed through the states that may include direct monetary aid known as Refugee Cash Assistance or Temporary Assistance to Needy Families, also known as TANF, a federal aid program administered by each State; Refugee Medicaid, a federal medical assistance program administered by the states; and Supplemental Nutritional Assistance Program, or SNAP, assistance, a program providing access to food that is funded by the United States Department of Agriculture, but is administered by the states.  (*Id.* ¶ 19).  As noted above, monies are also available for employment services and training and the refugees are entitled to various health services.  (*Id.* ¶ 20).

### C.       The State of Indiana and refugees

The State of Indiana—through its Family and Social Services Administration, which employs Indiana's Refugee Coordinator—receives refugee resettlement monies from the federal Office of Refugee Resettlement.   *See* U.S. Department of Health & Human Services, Administration for Children & Families, Office of Refugee Resettlement, *FFY 2013-14 State of Indiana ORR Funded Programs*, *at* http://www.acf.hhs.gov/programs/orr/resource/ffy-2013-14-state-of-indiana-orr-funded-programs (last visited Dec. 2, 2015)[3]; Indiana Family and Social Services Administration, *FSSA Organizational Directory*, *at* http://www.in.gov/fssa/3441.htm (last visited Nov. 25, 2015) (listing Family and Social Services Administration employee Matt Schomburg as Director, Refugee Assistance).   It has submitted a state plan agreeing to comply with all federal requirements concerning refugees sent to Indiana.   (Miller-Varga ¶ 22).

### D.       Exodus Refugee Immigration, Inc.

Exodus, an Indiana not-for-profit corporation, is one of three agencies in Indiana that receives federally-approved refugees to resettle in the state.   (*Id.*  ¶¶ 4-5).   Its mission is to work with refugees—worldwide victims of persecution, injustice and war—to establish self-sufficient lives in freedom and sanctuary for themselves and their families in Indiana.   (*Id. ¶* 6*).   In fiscal year 2015 it assisted 892 refugees and it is scheduled to receive 890 in the current fiscal year. (*Id. ¶* 7).   Of these 890 refugees, 215 are projected to be from North East / South Asia.   (*Id.* ¶ 8). This number will largely be made up of refugees from Syria.   (*Id.*).

Exodus has a cooperative agreement with Church World Service and Episcopal Migration Ministries, two of the Voluntary Agencies, to resettle refugees in the Indianapolis areas.   (*Id. ¶* 23).   Through PRM's Reception and Placement program, passed through the two

---

[3]       This is the most recent fiscal year available at the current time.   It discloses that the Family and Social Services Administration received more than $4.8 million dollars through the Office of Refugee Resettlement.

Voluntary Agencies, it receives a set amount for each refugee who is placed to assist with necessary costs, including administrative expenses.  (*Id.* ¶ 24).  Additionally, it has a grant agreement with the Family and Social Services Administration to provide refugee employment services.  (*Id.* ¶ 25 and Exhibits A and B to Miller-Varga).  Although this money comes from the federal government, it is paid to the Family and Social Services administration which will then make grant reimbursement payments to Exodus.  (*Id.* ¶ 26).  Exodus uses this money to hire staff and to provide refugee employment services that include, among other things, specific services provided to refugees, Exodus-staff costs, and Exodus-administrative costs.  (*Id.* ¶ 27).

As noted above, refugees are eligible for various benefits paid to them with federal funds administered by the Indiana Family and Social Services Administration: Refugee Cash Assistance or TANF, Refugee Medicaid, and SNAP benefits.  (*Id.*  ¶ 19).  Additionally, the Indiana State Department of Health receives federal funding to provide screening, immunization, and other health services to the refugees who are assigned to ESI.  (*Id.* ¶ 28).  The Department of Health also passes through federal funding directly to Exodus for a health promotion programs for the refugees.  (*Id.* ¶ 29 and Exhibit C to Miller-Varga).

### E.       The response of the defendants to Syrian refugees and its effect on Exodus

In August of 2015 Exodus was notified that a refugee family from Syria had been approved for placement in Indiana with Exodus being assigned to work with the family.  (*Id.*  ¶ 30).  In anticipation of the family's arrival Exodus expended both resources and staff time to, among other things: procure an apartment for the family, get the apartment ready and do other work in anticipation of the family's arrival.  (*Id.* ¶ 31).  This necessarily diverted both staff time and resources away from other projects.  (*Id.* ¶ 32).

However, shortly before the family was due to arrive, the Governor of Indiana announced

that he was suspending resettlement of Syrian, and only Syrian, refugees in Indiana.

> In the wake of the horrific attacks in Paris, effective immediately, I am directing all state agencies to suspend the resettlement of additional Syrian refugees in the state of Indiana pending assurances from the federal government that proper security measures have been achieved. Indiana has a long tradition of opening our arms and homes to refugees from around the world but, as governor, my first responsibility is to ensure the safety and security of all Hoosiers. Unless and until the state of Indiana receives assurances that proper security measures are in place, this policy will remain in full force and effect.

Indiana Governor Mike Pence, *Governor Pence Suspends Resettlement of Syrian Refugees in Indiana*, *at* http://www.in.gov/activecalendar/EventList.aspx?view=EventDetails&eventidn =239126&information_id=233816&type=&syndicate=syndicate (last visited Dec. 2, 2015).

Following the Governor's announcement, the Family and Social Services Administration notified Exodus that it should alert its "national resettlement agency that the scheduled placement for the Syrian family scheduled to arrive this Thursday, November 19, and all subsequent Syrian arrivals be suspended or redirected to another state that is willing to accept Syrian placements until assurances that proper security measures are in place have been provided by the federal government." (Miller-Varga ¶ 34 and Exhibit D to Miller-Varga). The Syrian family that was supposed to come to Indiana and work with Exodus was instead diverted to Connecticut where the family has been resettled. (*Id.* ¶ 35).

Although this one family did not resettle in Indiana, Exodus is scheduled to receive additional Syrian refugee families. (*Id.* ¶ 37). At the current time there are 19 Syrians, in four groups, approved for refugee status by the federal government that have been assigned to Exodus and who are expected to arrive in Indiana in the next few weeks or months. (*Id.* ¶ 38). Exodus will be given two weeks' notice, or less, before the refugees arrive. (*Id.* ¶ 39). Exodus has been notified by its national partners who place refugees with them that despite the Governor's suspension the Syrian refugees will be placed with Exodus and Exodus is committed to resettling

Syrians in 2016. (*Id.* ¶¶ 40-41).

The decision by the Governor to suspend the State's resettlement efforts will be extremely and irreparably detrimental to Exodus. (*Id.* ¶¶ 42-49). The State's actions entirely frustrate Exodus's mission, which is to serve *all* refugees who are placed with it, regardless of their place of origin. (*Id.* ¶ 49). With the suspension, Exodus will not receive the employment and health grant monies from the State of Indiana for the Syrian refugees, which it receives for other refugees from other countries. (*Id.* ¶ 43). This will be very harmful to Exodus, a not-for-profit organization that simply cannot afford this loss of funding without severe and irreparable negative repercussions on its ability to provide for the families it serves. (*Id.* ¶ 44). These serious repercussions will be exacerbated when the State refuses to release the federal funding and provide the direct assistance to the refugees to which they are entitled: Refugee Cash Assistance, TANF, Refugee Medicaid, and SNAP benefits. (*Id.* ¶ 45 46). Even as Exodus attempts to shift other funding to fulfill its organizational mission despite the withdrawal of funds by the State, this will result in services being taken away from other areas and will put a serious strain on the ability of Exodus to serve its population of refugees from Syria and other countries. (*Id.* ¶ 47). Not only will this jeopardize Exodus's ability to function and fulfill its mission, it will potentially put it in breach of its agreements with its Voluntary Agencies. (*Id.* ¶ 48).

**Legal Argument**

**I.     Exodus will prevail on the legal merits of its claims**

**A.     The suspension of the resettlement of Syrian refugees is preempted by federal law**

By virtue of the Supremacy Clause of the U.S. Constitution, state action that interferes or conflicts with federal responsibilities and directives is preempted and cannot stand. *See* U.S.

Const. art. VI, § 2. Indiana's suspension of Syrian refugees is preempted in two respects: first, it is an impermissible state regulation of immigration and is both conflict- and field-preempted by acts of Congress; and second, it infringes on the exclusively federal role in conducting foreign policy.[4]

    *1. The defendants' action is preempted by the Immigration and Nationality Act of 1952, as amended by the Refugee Act of 1980*

By virtue of the Supremacy Clause, it is "[a] fundamental principle of the Constitution that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Preemption requires an examination of congressional intent, and federal regulations have no less preemptive effect than federal statutes. *Fid. Fed. Savings & Loan Ass'n v. De la Cuesta*, 458 U.S. 141, 152-53 (1982). State action may thus be preempted in three ways: "by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (citations omitted). The last two forms of preemption, field and conflict preemption, are both considered "implied." *See, e.g.*, *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Implied field preemption occurs when a state attempts to "regulate[] conduct in a field the Congress intended the Federal Government to occupy exclusively." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). This intent may be inferred when the federal scheme is "so pervasive as to make reasonable the inference that Congress left no room for the

---

[4]    Exodus acknowledges, as it did in its complaint, that the U.S. Supreme Court recently held that the Supremacy Clause does not contain a private right of action to enforce Section 30(A) of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A). *See Armstrong v. Exceptional Child Care, Inc.*, __ U.S. __, 135 S. Ct. 1378 (2015). In so holding, however, the Court reiterated that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* at 1384. *Armstrong* thus stands only for the principle that "the Medicaid Act implicitly precludes private enforcement of § 30(A)," *id.* at 1385, and is no impediment to Exodus's claims here.

States to supplement it." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal quotations omitted).   The last category of preemption—"implied conflict preemption"—occurs either when "compliance with both federal and state regulations is a physical impossibility" or when the challenged state action "stands as an obstacle to the accomplishment and the execution of the full purposes and objectives of Congress." *Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492, 2501 (2012) (citations omitted).

This Court need not decide at present whether the suspension of Syrian refugees actually conflicts with the terms of the INA and the Refugee Act, for an abundance of controlling authority establishes clearly that the federal government is the sole arbiter of immigration— including refugee resettlement—in the United States, and Exodus is therefore likely to prevail on its field preemption claim.   As noted above, the U.S. Constitution leaves to the federal government the exclusive authority to establish immigration policy and to regulate immigration. *See* U.S. Const. art. I, § 8, cl. 3-4.   The Supremacy Clause accordingly forbids any state "regulation of immigration." *DeCanas v. Bica*, 424 U.S. 351, 353-54 (1976).   As the U.S. Supreme Court reiterated in rejecting one state's attempt to forge its own policies pertaining to immigration,

> [t]he federal policy to determine immigration policy is well-settled.  Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws.  Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad.
>
> It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate states.

*Arizona*, 132 S. Ct. at 2498-99 (internal citations omitted).   This flat prohibition on state regulation of immigration is required because immigration regulation is "unquestionably

exclusively a federal power." *DeCanas*, 424 U.S. at 354; *see also id.* at 355 (federal "constitutional power" to regulate immigration preempts state law "whether latent or exercised"); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration . . . is vested solely in the Federal Government."). Therefore, only the federal government may establish immigration policy and the process of "determin[ing] who should or should not be admitted into the country," *DeCanas*, 424 U.S. at 355, and the "conditions lawfully imposed by Congress upon . . . residence of aliens," *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948); *see also Toll v. Moreno*, 454 U.S. 1, 11 (1982). "[T]he regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject . . . the law of the state . . . must yield to it." *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). There can be no serious doubt that Indiana's suspension of Syrian refugees infringes upon this exclusively federal role in regulating immigration: even though Congress has enacted a detailed statutory scheme governing immigration generally and refugee resettlement in particular, and even though federal officers acting pursuant to their statutory authority have determined placement in Indiana appropriate for many Syrians, Indiana has unilaterally decided to close its borders to these persons.

Although it is not necessary to go any further here given that field preemption is most clearly present, it is also apparent that defendants' action actually conflicts with federal law and it cannot stand for this reason as well. As indicated at the outset, Congress has provided that refugee assistance must be administered "without regard to race, religion, nationality, sex or political opinion." 8 U.S.C. § 1522(a)(5). The implementing regulations also specify that "assistance and services . . . will be provided to refugees without regard to race, religion, nationality, sex, or political opinion." 45 C.F.R. § 400.5(g). The Office of Refugee

Resettlement within the U.S. Department of Health and Human Services has recently issued a letter making clear that any state adopting a policy similar to the Governor's "would not be in compliance with . . . state plan requirements," *see* United States Department of Health and Human Services – Office of Refugee Resettlement, *Resettlement of Syrian Refugees*, *available at* http://www.acf.hhs.gov/programs/orr/resource/resettlement-of-syrian-refugees (last visited Dec. 2, 2015) (attached to this memorandum as Exhibit 2), and Indiana has no answer for its blatant violation of its agreement with the federal government. On top of this, federal law also specifies the manner in which refugee placement is to be determined: after meeting with representatives of state and local governments to plan and coordinate "the appropriate placement of refugees among the various States and localities," federal authorities making this determination must take into account numerous factors, including the proportion of refugees in a geographical area; the availability of employment opportunities, affordable housing, and other resources in the area; the likelihood that refugees placed in that area will become self-sufficient; and the secondary migration of refugees that might occur. 8 U.S.C. § 1522(a)(2)(C). Although states may make recommendation on refugee placement, 8 U.S.C. § 1522(a)(2)(D), these recommendations are not binding on the federal government. Applying these congressionally mandated factors, the United States has determined that placement in Indiana is appropriate for numerous Syrian refugees. Nonetheless, Indiana refuses to accept this placement or provide assistance to those persons placed here. This action quite clearly "stands as an obstacle to the accomplishment and the execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co.*, 461 U.S. at 204 (internal quotations omitted).

It is clear that Congress has occupied the field of immigration in general and refugee resettlement in particular, and has specifically detailed the role for the states in resettling

refugees. Indiana's action in suspending Syrian resettlement is an attempt to enter a field from which it has been precluded.  Moreover, Indiana's action conflicts with federal statutory and regulatory enactments. Indiana's action is preempted.

> 2.  *The defendants' action interferes with the exclusively federal role in conducting foreign policy, and is preempted*

The State's restriction on refugee resettlement is also preempted because it impacts directly on the United States' exclusive power in foreign relations, as well as on its obligations under international treaties.  Indiana has taken the extraordinary step of refusing to accept Syrian refugees into the state.  In so doing, it has insinuated itself into the relationship between the United States and foreign countries and has opted to create its own international policies.  "That fifty individual states or one individual state should have a foreign policy is absurdity too gross to be entertained.  In matters affecting the intercourse of the federal nation with other nations, the federal nation must speak with one voice."  *United States v. Arizona*, 641 F.3d 339, 367 (9th Cir. 2011) (Noonan, J., concurring), *aff'd in significant part*, 132 S. Ct. 2492 (2012).

Ultimately, it is the President who is given the constitutional authority to act in the areas of relations with other countries.  *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (holding that a California law attempting to regulate insurance policies sold in Europe during the Holocaust impermissibly interfered with executive power and was preempted).  "Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'"  *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring)).  Congress also has responsibilities through its war and foreign commerce powers. *Id.*  Therefore, "[n]o State can rewrite our foreign policy to conform to its own domestic policies.

Power over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). Thus, the Supreme Court has long held that "[f]or local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." *Chae Chan Ping v. United States*, 130 U.S. 581, 606 (1889). Consequently, a law that has a direct impact on foreign relations is preempted and void, even if not directly conflicting with a treaty. *See Zschernig v. Miller*, 389 U.S. 429, 441 (1968) (holding that an Oregon statute that imposed conditions on non-resident aliens taking property by succession or testamentary disposition was invalid as intruding on responsibilities over foreign affairs that are entrusted to the President). State action directly conflicting with treaty obligations, of course, is just as impermissible. *See United States v. Belmont*, 301 U.S. 324, 327, 331 (1937) ("[N]o state policy can prevail against the international compact here involved. . . . Plainly, the external powers of the United States are to be exercised without regard to state laws or policies. The supremacy of a treaty in this respect has been recognized from the beginning."); *see also, e.g.*, *Garamendi*, 539 U.S. at 416-17; *Pink*, 315 U.S. at 230-31.

The Governor's refusal to accept Syrian refugees impermissibly infringes on federal authority over foreign affairs and directly interferes with treaty obligations. Specifically, the refusal to accept Syrian refugees is directly contrary to the United States' duties under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol"), which was ratified by Congress and which binds the United States to respect Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees ("Refugee Convention").[5] This treaty recognizes "the right of

---

[5]     Both the Refugee Protocol and the Refugee Convention, along with an introductory note from the Office of the United Nations High Commissioner for Refugees, are available at http://www.unhcr.org/3b66c2aa10.html (last visited Nov. 25, 2015).

persons to seek asylum from persecution in other countries," Refugee Convention and Protocol,
Introductory Note by the Office of the U.N. High Commissioner for Refugees, at 2 (Dec. 2010),
and, among other things, requires signatories to "apply the provisions of [the Refugee
Convention] to refugees without discrimination as to race, religion or country of origin,"
Refugee Convention, art. 3.[6]   It also requires that the United States ensure that refugees are
accorded the same treatment as nationals in the provision of rationing, public education, public
relief and assistance, and other matters, Refugee Convention, art. 20, 22-24, and the same
treatment as other lawful immigrants in the provision of public education, Refugee Convention,
art. 22.

Indiana's refusal to accept or provide assistance to Syrian refugees not only impacts on
foreign relations—requiring a state-by-state response to an international refugee crisis, which is
by itself sufficient to find preemption—but it conflicts directly with these treaty obligations.  *See,
e.g.*, *Belmont*, 301 U.S. at 327, 331.  Even though the United States is bound not to discriminate
based on nationality in accepting or providing assistance to refugees, Indiana has chosen to do
so.  Even though the United States is bound to provide the same public relief to refugees as
citizens enjoy, Indiana refuses to do so.

> [S]tate law must yield when it is inconsistent with or impairs the policy or
> provisions of a treaty or of an international compact or of an international
> compact or agreement.  Then the power of a State to refuse enforcement of rights
> based on foreign law which runs counter to the public policy of the forum must
> give way before the superior Federal policy evidenced by a treaty or international

---

[6]     This provision of the Refugee Convention is but one of numerous treaty-based protections against
discrimination based on persons' nationality.  *See* Universal Declaration of Human Rights (1948), art. 2
(available   at   http://www.ohchr.org/EN/UDHR/Pages/Language.aspx?LangID=eng);   International
Covenant on Civil and Political Rights (1976), art. 2.1 (available at http://www.ohchr.org/EN/
ProfessionalInterest/Pages/CCPR.aspx); International Covenant on Economic, Social and Cultural Rights
(1976), art. 2.2 (available at http://www.ohchr.org/EN/ProfessionalInterest/Pages/CESCR.aspx);
International Convention on the Elimination of All Forms of Racial Discrimination (1969), art. 7
(available at http://www.ohchr.org/EN/ProfessionalInterest/Pages/CERD.aspx).  All citations in this
footnote were last visited on November 25, 2015.

compact or agreement.

*Pink*, 315 U.S. at 230-31 (internal citations omitted). The Constitution does not tolerate the risk that a state's independent refusal to accept refugees will lead to serious international consequences. The Governor's policy implicates the exclusive powers of the federal government in an area where federal authority must be exclusive—"[i]f it be otherwise, a single State can, at her pleasure, embroil us in disastrous quarrels with other nations," *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875). Indiana's actions must yield to the carefully crafted decisions of the federal government with respect to refugee resettlement, and to the binding obligations of international treaties to which the United States is a signatory.

**B.      The actions of the defendants violate Title VI of the Civil Rights Act**

Indiana's policy of barring Syrian refugees from resettling in Indiana is also discriminatory. Under Title VI of the Civil Rights Act of 1964, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d. Private parties may bring claims under Title VI for both injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). The two elements for establishing a cause of action pursuant to Title VI are "(1) that there is racial or national origin discrimination and (2) the entity engaging in discrimination is receiving federal financial assistance." *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993).

Coextensive with the Equal Protection Clause of the Fourteenth Amendment, discrimination occurs under Title VI when the state "intentionally classif[ies] similarly situated individuals for different treatment on the basis of an impermissible characteristic, such as race,

national origin, or gender." *Kelley v. Bd. of Trustees of Univ. of Illinois*, 832 F. Supp. 237, 242

(C.D. Ill. 1993), *aff'd sub nom. Kelley v. Bd. of Trustees*, 35 F.3d 265 (7th Cir. 1994); *see also*

*Davis v. City of New York*, 959 F. Supp. 2d 324, 366 (S.D.N.Y. 2013) ("'The reach of Title VI's

protection extends no further than the Fourteenth Amendment,' but it extends just as far.")

(quoting *United States v. Fordice*, 505 U.S. 717, 732 n.27 (1992)).   Intentional discrimination is

shown either by providing direct evidence of discrimination or by alleging "circumstances that

support an inference of discrimination." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11

(2002).   Direct evidence of discrimination is evidence that, "if believed by the trier of fact, will

prove the particular fact in question without reliance upon inference or presumption." *Randle v.*

*LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir. 1989).   Such evidence "includes

any statement or written document showing a discriminatory motive on its face." *Portis v. First*

*Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 329 (5th Cir. 1994).

Here, the discriminatory policy is explicit: the Governor stated that "effective

immediately, I am directing all state agencies to suspend the resettlement of additional Syrian

refugees in the state of Indiana"; and the next day, the Family and Social Services

Administration notified Exodus in writing to alert its "national resettlement agency that the

scheduled placement for the Syrian family scheduled to arrive this Thursday, November 19, and

all subsequent Syrian arrivals be suspended or redirected to another state that is willing to accept

Syrian placements until assurances that proper security measures are in place have been provided

by the federal government."   (Miller-Varga ¶ 34 and Exhibit D to Miller-Varga).   The directive

applies solely to Syrian refugees and the only criterion for barring refugees from the State of

Indiana is their Syrian nationality.   The purpose of the Governor's directive is to exclude Syrians

from resettlement in Indiana and the benefits that would flow to them from the State.   Indiana is

engaged in direct and explicit discrimination on the basis of national origin.

The second element of a Title VI claim is equally clear. The programs administered by Indiana—including refugee assistance, Medicaid, TANF, and SNAP—are all federally funded as are the monies being paid directly to Exodus by the state of Indiana pursuant to the agreements to provide employment-related and health services. *See* 8 U.S.C. § 1522.

The violation of Title VI here is confirmed by recent pronouncements of the federal government. As noted, on November 25, 2015, the federal Office of Refugee Resettlement issued a statement, indicating that states that, like Indiana, receive federal refugee resettlement monies may not discriminate based on a refugee's country of origin and a state's discrimination on this ground not only would violate its state plan requirements, 8 U.S.C. § 1522(a)(5), and 45 C.F.R. § 440.5(g), but would also violate Title VI. (Exhibit 2, attached).

The Governor's directive, denying benefits from federally-funded programs to Syrian refugees, constitutes intentional discrimination on the basis of national origin under Title VI of the Civil Rights Act of 1964. As the Third Circuit aptly stated:

> Discrimination stems from a reliance on immaterial outward appearances that stereotype an individual with imagined, usually undesirable, characteristics thought to be common to members of the group that shares these superficial traits. It results in a stubborn refusal to judge a person on his merits as a human being. Our various statutes against discrimination express the policy that this refusal to judge people who belong to various, particularly disadvantaged, groups is too costly to be tolerated in a society committed to equal individual liberty and opportunity.

*Bennun v. Rutgers State Univ.,* 941 F.2d 154, 173 (3d Cir.1991). Indiana's discriminatory policy is explicit and egregious, and it violates federal law. It must be enjoined for this reason as well.

### C.   The actions of the defendants violate equal protection

As noted immediately above, the actions of the defendants here discriminate against refugees from Syria based on their nationality. Not only does this discrimination violate Title VI

of the Civil Rights Act, but it also violates equal protection.

Under equal protection, a law that "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class" is reviewed under the strict scrutiny standard. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) (footnotes omitted). Strict scrutiny requires the defendants to demonstrate that the "classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (internal citation omitted). This is a rigorous standard and the Supreme Court has noted that it is "'strict' in theory but usually 'fatal' in fact" inasmuch as "[o]nly rarely are statutes sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) (internal citation omitted).

It is well-established that discrimination against aliens who are lawfully in the United States is subject to strict scrutiny. Thus, in *Takahashi*, *supra*, the Supreme Court struck down a California statute that had denied fishing licenses to lawful residents who were ineligible for citizenship noting that "[t]he Fourteenth Amendment . . . embod[ies] a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." 334 U.S. at 420.[7] In *Graham v. Richardson*, 403 U.S. 365 (1971), the Court likewise invalidated statutes that prohibited aliens lawfully in the United States from receiving public assistance. In doing so the Court noted that classifications based on alienage "are inherently suspect and subject to close judicial scrutiny." *Id.* at 372.

Of course, Governor Pence and the Family and Social Services Administration are not

---

[7]    The Court in *Takahashi* invalidated a statute banning the issuance of fishing licenses to persons "ineligible to citizenship," 334 U.S. at 413, insofar as California was constitutionally prohibited from excluding "lawful residents of the State from making a living by fishing . . . while permitting all others to do so," *id.* at 421. A previous version of the statute at issue prohibited the issuance of a license to any "alien Japanese," although this version was amended pre-litigation "for fear that it might be 'declared unconstitutional.'" *Id.* at 413. Of course, the Governor's action here applies to only one nationality.

discriminating against all aliens, just ones from Syria.  However, this distinction does not save the defendants' efforts from being subjected to strict scrutiny.  For the Court in *Richardson* also noted that state classifications based on nationality are subject to the same strict scrutiny.  *Id. See also, e.g.*, *Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009) (strict scrutiny is applied to national-origin discrimination against lawfully admitted aliens); *Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 277 n.15 (9th Cir. 1982) (citing *Graham*, 403 U.S. at 371-72).

The Governor has asserted that the suspension order is based on his desire to ensure the safety and security of Hoosiers.  While, as a theoretical matter, ensuring safety is compelling, theorizing a hypothetical need is not sufficient to demonstrate a compelling state interest.  Instead, "[t]he State must specifically identify an 'actual problem' in need of solving."  *Brown v. Entertainment Merchants Ass'n*, __U.S.__, 131 S.Ct. 2729, 2738 (2011) (quoting *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000)).  "Conclusory statement[s]" are not enough. *Playboy*, 529 U.S. at 822.  Alluding to a terrorist attack in Paris is simply not the identification of "an actual problem" with regard to the Syrian refugees coming to America after a lengthy and extensive review by the federal government.

Nor is the suspension of resettlement ordered by the Governor the least restrictive alternative to meet security concerns, even if these concerns were compelling.  A total ban on all Syrian refugees because of a theoretical concern that one refugee may engage in terrorist activities is the antithesis of least restrictive alternative.  To the contrary, it is a categorical assumption (not based on *any* facts), and is the most restrictive means of addressing the "problem" that can be imagined.  Of course, the least restrictive thing to do is to individually review all refugees being placed.  But, of course, the State of Indiana cannot do this as the placement of refugees is solely a federal responsibility. And, the federal government is already

doing this.  This highlights what is the actual least restrictive alternative—to rely on the detailed and lengthy screening process to which the United States subjects all refugees.

The Governor has imposed a draconian remedy for a hypothetical problem.  This would not pass low-level scrutiny, let alone the strict scrutiny demanded here.  The actions of the Governor, and the Secretary of the Family and Social Services Administration in following the Governor's lead, violate equal protection.

## II.    The other requirements for the grant of a preliminary injunction are met here

### A.    The actions of the defendants are causing irreparable harm for which there is no adequate remedy at law

The actions of the defendants therefore violate the Equal Protection Clause and civil rights laws, and are also preempted.  It has been repeatedly held that denial of constitutional rights is irreparable harm in and of itself.  "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."  *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also, e.g.*, *Cohen v. Coahoma County, Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) ("It has repeatedly been recognized by the federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.").  The same is true if a plaintiff is injured by state action that is preempted by federal law.  *See Valle del Sol v. Whiting*, No. CV-10-1061-PHX-SRB, 2012 WL 8021265, at *6 (D. Ariz. Sept. 5, 2012) ("[I]f an individual or entity faces the imminent threat of enforcement of a preempted state law and the resulting injury may not be remedied by monetary damages, the individual or entity is likely to suffer irreparable harm."), *aff'd*, 732 F.3d 1006 (9th Cir. 2013), *cert. denied*, 134 S.Ct. 1876 (2014); *cf. Arizona*, 132 S. Ct. at 2510 (affirming in substantial part a preliminary injunction issued on preemption grounds).

Moreover, the actions of the defendants, will continue to frustrate and thwart Exodus's basic mission—to work with all refugees so they can establish new lives for themselves and their families in Indiana.[8] Exodus cannot afford and compensate for the loss of federal grant money passed through the State of Indiana without severe negative repercussions on its ability to provide for the families it serves, and it will be difficult, if not impossible, for Exodus to make up for the loss of these monies and other services. This is also irreparable harm. As Judge Barker of this Court recognized in granting a preliminary injunction against cuts to foster care and adoption assistance payments paid by Indiana, "[t]here is much more than money at issue in this case. . . . It is the quality of care promised to the children under the applicable statues that is at stake in the case at bar. Any deficiency in such care cannot later be undone with monetary compensation." *C.H. v. Payne*, 683 F. Supp. 2d 865, 884 (S.D. Ind. 2010). The risk to the refugee families served by Exodus here is no less grave.

There is no adequate remedy at law that can remedy this irreparable harm. Only an injunction will prevent this harm.

### B.    The balance of harms favors Exodus

Without a preliminary injunction, therefore, Exodus and the refugees it serves will be subjected to irreparable harm for which there is no adequate remedy at law. If defendants are required to provide the federally mandated aid and services to the refugees and to Exodus they will suffer no harm whatsoever. Moreover, governmental entities cannot claim that being required to comply with the requirements of the Constitution is harmful. *See Christian Legal*

---

[8]    Frustration of an organization's mission is, itself, irreparable harm. *See, e.g.*, *Valle del Sol*, 732 F.3d at 1029 (noting the presence of irreparable harm where, among other things, the "the organizational plaintiffs have shown ongoing harms to their organizational missions as a result of the statute"); *Michigan Protection & Advocacy Service, Inc. v. Flint Community Schools,* No. 15-12470, 2015 WL 7423591 at *4 (E.D. Mich. Nov. 23, 2015) ("the plaintiff will suffer irreparable harm if it is not able to obtain the records necessary for it to pursue its mission"); *Caron Found. of Florida, Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1373 (S.D. Fla. 2012) ("Frustration of a rehabilitation provider's mission can cause irreparable harm.").

*Soc'y v. Walker,* 453 F.3d 853, 867 (7th Cir. 2006) (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all").  The balance of harms therefore favors the issuance of equitable relief.

### C.    The public interest will not be disserved by the grant of a preliminary injunction

"Vindication of constitutional freedoms is in the public interest."  *See, e.g.*, *McIntire v. Bethel School,* 804 F. Supp. 1415, 1429 (W.D. Okla. 1992) (internal citation and quotation omitted).  Moreover, it is in the public interest to enjoin laws that may have profound deleterious international consequences.  "[T]he public interest favor[s] preserving the uniform application of federal immigration standards."  *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 701 F. Supp. 2d 835, 859 (N.D. Tex. 2010), *aff'd,* 726 F.3d 524 (5th Cir.) (en banc), *cert. denied,* 134 S.Ct. 1491 (2014). Finally, "'it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029 (internal citation and quotations omitted).

### D.    The preliminary injunction should issue without bond

Although an injunction will require the State to pass through the federal monies to Exodus and the Syrian refugees it is resettling, these are monies that have already been appropriated to the State and that the State would be willing to pay if refugees from other countries were being served.  Therefore, the grant of the preliminary injunction will not threaten any real monetary injury to the defendants.  In the absence of such injury, no bond should be required.  *See, e.g.*, *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

**Conclusion**

"The history of the United States is in part made of the stories, talents, and lasting contributions of those who crossed oceans and deserts to come here."  *Arizona*, 132 S. Ct. at 2510.  In barring refugees from Syria, Indiana has overstepped its authority and has violated Title VI of the Civil Rights Act as well as the Equal Protection Clause.  A preliminary injunction should therefore issue in this case.  The defendants should be enjoined from taking any actions to interfere with the resettlement of Syrian refugees in the State of Indiana and they should further be required to provide all monies and services due refugees resettled in the State of Indiana by Exodus Refugee Immigration.

s/ Kenneth J. Falk

Kenneth J. Falk
No. 6777-49


s/ Gavin M. Rose

Gavin M. Rose
No. 26565-53


s/ Jan P. Mensz

Jan P. Mensz
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN  46202
317-635-4059
Fax: 317-635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org


Judy Rabinovitz
Motion to Appear *Pro Hac Vice* to be filed
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
212-549-2618
fax: 212-549-2654

jrabinovitz@aclu.org

Omar Jadwat
Motion to Appear *Pro Hac Vice* to be filed
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
212-549-2620
fax: 212-549-2654
ojadwat@aclu.org

Cecillia Wang
Motion to Appear *Pro Hac Vice* to be filed
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
415-343-0775
fax: 415-395-0950
cwang@aclu.org

Attorneys for Plaintiff

<u>Certificate of Service</u>

I hereby certify that on this 2nd day of December, 2015, a copy of the foregoing was filed electronically with the Clerk of this Court. A copy will be served by the Court's system on

Thomas M. Fisher
Solicitor General
Office of the Attorney General
tom.fisher@atg.in.gov

Patricia O. Erdmann
Chief Counsel for Litigation
Office of the Attorney General
patricia.erdmann@atg.in.gov

<u>s/ Kenneth J. Falk</u>
Kenneth J. Falk
Attorney at Law

~ 29 ~