UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

EXODUS REFUEFEE IMMIGRATION, INC.,    )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        No. 1:15-cv-1858-TWP-DKL
                                       )
MIKE PENCE, *et al.*,                  )
                                       )
                    Defendants.        )

---

**Plaintiff's Reply Memorandum in Support of Motion for Preliminary Injunction**

---

Kenneth J. Falk
Gavin M. Rose
Jan P. Mensz
ACLU OF INDIANA
1031 E. Washington St.
Indianapolis, IN  46202
317-635-4059
Fax: 317-635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org

Cecillia Wang, *Pro Hac Vice*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
415-343-0775
fax: 415-395-0950
cwang@aclu.org

*Attorneys for Plaintiff*

Judy Rabinovitz, *Pro Hac Vice*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
212-549-2618
fax: 212-549-2654
jrabinovitz@aclu.org

Omar Jadwat, *Pro Hac Vice*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
212-549-2620
fax: 212-549-2654
ojadwat@aclu.org

TABLE OF CONTENTS

Table of Authorities ................................................................................. i

Introduction ........................................................................................... 1

Facts ...................................................................................................... 1

    I.    The essential facts are uncontested and the State has conceded that it intends to deny Exodus necessary federal funding that passes through the State .................................................................................... 2

    II.    The State's material concerning Syrian refugees is largely irrelevant and unreliable, and provides no support for the State's actions ................... 3

Argument…… ...................................................................................... 7

    I.    Exodus will prevail on the merits of its claims ........................... 7

        A.    The State's denial of federal funding to Exodus for the federally approved Syrian refugees that it serves is preempted by federal law ................................................................................. 7

            1.    Exodus may enforce its preemption claims ................... 7

            2.    The State's action is preempted ..................................... 13

                a.    The State's action runs afoul of the Refugee Act .................................................................. 13

                b.    Exodus's preemption claims are not "curbed" by any interest in protecting public safety ............... 15

                c.    The State is not saved by what it characterizes as its "temporary and limited" refusal to support Syrian refugees ................................................ 18

        B.    The State's denial of federal funding to serve federally approved Syrian refugees violates both equal protection and Title VI of the Civil Rights Act .................................................................. 24

            1.    Exodus has standing to raise its equal protection and Title VI claims ...................................................................... 24

                a.    Both Exodus and the Syrian refugees are damaged by the State's actions ......................................... 24

|   |   | b. | Exodus has standing to raise the equal protection claims here ............................................................ | 25 |

|   |   |   | i. | The three-part test of *Singleton* demonstrates that Exodus has standing to raise the refugees' constitutional claims ............................... | 25 |

|   |   |   | ii. | A business has standing to raise legal claims of potential clients when governmental actions affect the clients and injure the business, and under this principle Exodus clearly has standing .................................................... | 26 |

|   |   |   | iii. | Exodus has standing under the principles of *Havens* ........................................................ | 28 |

|   |   | c. | Exodus has standing to pursue the Title VI claim ................................................................. | 29 |

|   | 2. | | The State is discriminating on the grounds of nationality and/or national origin ........................................ | 31 |

|   | 3. | | The State's actions violate equal protection and Title VI ....................................................................... | 31 |

II. | | | | The other requirements for the grant of a preliminary injunction are met here ..................................................................................... | 33 |

| A. | | | Exodus faces irreparable harm for which there is no adequate remedy at law ............................................................... | 33 |

| B. | | | The balance of harms and the public interest favor an injunction ............................................................... | 34 |

Conclusion ............................................................................................... | 35 |

Certificate of Service ....................................................................... | 36 |

**TABLE OF AUTHORITIES**

**Cases:**

*Aviation West Charters, Inc. v. United Healthcare Ins. Co.*, No. CV-14-00338-PHX-NVW, 2014 WL 5814232 (D. Az. Nov. 10, 2014) ..................... 5

*Alharbi v. Beck*, 62 F. Supp. 3d 202 (D. Mass. 2014) .................... 4

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)................................... 12, 15, 16, 17

*Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492 (2012)................................. 14, 20

*Armstrong v. Exceptional Child Care, Inc.*, __ U.S. __, 135 S. Ct. 1378 (2015)................ *passim*

*Bennett v. Spear*, 520 U.S. 154 (1997) ..................................... 25

*Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905 (S.D. Ind. 2011) ....................... 12

*Campbell v. Hussey*, 368 U.S. 297 (1961) ................................... 11

*Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703 (4th Cir. 2014). ............................................. 30

*Chapman v. Houston Welfare Rights Organ.*, 441 U.S. 600 (1979)............................. 22

*City of Chicago v. Lindley*, 66 F.3d 819 (7th Cir. 1995) ............................. 30

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)............................ 33

*Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1195 (N.D. Cal. 2009)............................................. 29

*Council of Ins. Agents & Brokers v. Gallagher*, 287 F. Supp. 2d 1302 (N.D. Fla. 2003) ........... 26

*Craig v. Boren*, 429 U.S. 190 (1976)...................................... 26

*Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008) ............................................. 28

*D.U. v. Rhoades*, No. 13-CV-1457, 2015 WL 224932 (E.D. Wis. Jan. 15, 2015) ....................... 4

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, __ U.S. __, 132 S. Ct. 1204 (2012).................... 22

*Dye v. Kinkade*, No. 2:15-cv-04021-MDH, 2015 WL 7313424 (W.D. Mo. Nov. 19, 2015)......... 8

*El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742 (9th Cir. 1991) ........................................................................................................ 29

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86 (1973) ........................................................ 31

*Foster v. Love*, 522 U.S. 67 (1997) ............................................................................. 11

*Friends of East Hampton Airport, Inc. v. Town of East Hampton*, No. 15-CV-2246, 2015 WL 3936346 (E.D.N.Y. June 26, 2015), *appeal pending*, Nos. 15-2334 & 15-2465 (2d Cir.) ......... 8

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992) ..................................... 21

*Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359 (S.D. Fla. 2014) ............................................. 4

*Georgia Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012) 29

*Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1263-66 (11th Cir. 2012) ...................................................................................... 20

*Goodman v. Ill. Dep't of Fin. & Prof. Regulation*, 430 F.3d 432 (7th Cir. 2005) ......................... 4

*Graham v. Richardson,* 403 U.S. 365 (1971) ............................................................. 31, 32

*Grutter v. Bollinger,* 539 U.S. 306, 343 (2003) ........................................................... 33

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................... 3, 28, 29

*Hispanic Interest Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236 (11th Cir. 2012) .. 29

*Hudson Valley Freedom Theater, Inc, v. Heimbach*, 671 F.2d 702 (2d Cir. 1982), ...................... 27

*In re Easysaver Rewards Litigation*, 737 F. Supp. 2d 1159 (S.D. Cal. 2010) ............................... 4

*Johnson v. California*, 543 U.S. 499 (2005) ............................................................... 32

*Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012) ........................................................ 25

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013), *cert. denied* .............................. 19

*LaBella Winnetka v. Vill. of Winnetka*, 628 F.3d 937 (7th Cir. 2010) ................................... 33

*Lazaro v. U.S. Dep't of Agric*, 186 F. Supp. 2d 1203 (M.D. Fla. 2001) .................................... 4

*Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013), *cert. denied,* ............................ 19

*Marin-Garcia v. Holder*, 647 F.3d 666 (7th Cir. 2011) ..................................................... 25

ii

*Massey v. Helman*, 196 F.3d 727 (7th Cir. 1999) ........................................................ 25

*Nat'l Fed. of Indep. Business v. Sebelius*, __ U.S. __, 132 S. Ct. 2566 (2012) ............................ 23

*Ondo v. City of Cleveland*, 795 F.3d 597 (6th Cir. 2015) ............................................ 31

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015), *pet. for cert. docketed*, No. 15-467 (2015) .................................................................. 24

*Pennsylvania Psych. Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278 (3d Cir. 2002) ... 26

*PhRMA v. Concannon*, 249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. PhRMA v. Walsh*, 538 U.S. 644 (2003); ......................................................................................... 13

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ...................................................... 27

*Planned Parenthood Southeast, Inc. v. Bentley*, __ F. Supp. 3d __, No. 2:15cv620-MHT, 2015 WL 6517875 (M.D. Ala. Oct. 28, 2015) ......................................................... 8

*Printz v. United States*, 521 U.S. 898 (1997) ........................................................ 23

*Railroad Transfer Service, Inc. v. Chicago*, 386 U.S. 351 (1967) .................................... 11

*Rosie D. v. Romney*, 410 F. Supp. 2d 18 (D. Mass. 2006) ............................................. 21

*Rothner v. City of Chicago*, 929 F.2d 297 (7th Cir. 1991) ............................................ 27

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) .................................................... 11

*Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226 (7th Cir. 1980) ................................. 29

*Singleton v. Wulff*, 428 U.S. 106 (1976) ........................................................ 25, 26

*St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232 (3d Cir. 2000) ................................................................................... 13

*Stasiukevich v. Nicolls,* 168 F.2d 474 (1st Cir. 1948) .................................................. 4

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948) ............................................. 9

*Taubman Realty Group Ltd. P'ship v. Mineta*, 320 F.3d 475 (4th Cir. 2003) ......................... 13

*Thorncreek Apartments III, LLC v. Village of Park Forest*, 970 F. Supp. 2d 828 (N.D. Ill. 2013). ......................................................................................... 28

*Tohono O'odham Nation v. Ducey*, __ F. Supp. 3d __, No. CV-15-01135-PHX-DGC, 2015 WL 5475290 (D. Ariz. Sept. 17, 2015) ........................................................................ 8

*Toll v. Moreno*, 458 U.S. 1 (1982) ................................................................................. 9

*Truax v. Raich*, 239 U.S. 33 (1915) ............................................................................... 9

*U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000) ........................................... 32

*United States v. Locke*, 529 U.S. 89 (2000) ................................................................ 18

*United States v. Pink*, 315 U.S. 203 (1942) ................................................................ 19

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013).................................. 19

*Valle de Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013), *cert. denied*.................... 19

*Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) .............. 20

*Warth v. Seldin,* 422 U.S. 490 (1975) ........................................................................... 25

*We Are America/Somos America, Coalition of Ariz. v. Maricopa Cty. Bd. of Supervisors,* 809 F. Supp. 2d 1084 (D. Ariz. 2011)........................................................................ 29

*Wilderness Society v. Kane County*, 632 F.3d 1162 (10th Cir. 2011) .......................... 13

*Zschernig v. Miller*, 389 U.S. 429 (1968) ......................................................... 12, 16, 17

## Constitutional Provisions:

U.S. Const. art. I, § 8 ..................................................................................................... 8

U.S. Const art. II............................................................................................................ 8

U.S. Const.  amend X..................................................................................................... 23

U.S. Const amend XIV (equal protection) .......................................................... *passim*

## Statutes:

7 U.S.C. § 2013.............................................................................................................. 2

8 U.S.C. § 1157(b)……………………………………………………………………….  15

8 U.S.C. § 1522 ............................................................................................ *passim*

8 U.S.C. §1522(a)(2) .......................................................................................... 15

8 U.S.C. § 1522(a)(2)(C). .................................................................................... 11

8 U.S.C. 1522(a)(5) ......................................................................................... 2, 13

8 U.S.C. § 1522(a)(6) .......................................................................................... 14

8 U.S.C. § 1522(a)(6)(A)(ii) ........................................................................... 10, 14

8 U.S.C. § 1522(a)(6)(B ....................................................................................... 11

8 U.S.C. § 1522(a)(7) ............................................................................................ 9

8 U.S.C. § 1522(a)(8) .......................................................................................... 10

42 U.S.C. § 1396c .............................................................................................. 10

42 U.S.C. § 1983 .................................................................................................. 7

Title VI of the Civil Rights Act of 1964 ........................................................ *passim*

**Rules:**

Fed. R. Evid. 701 ................................................................................................. 5

Fed. R. Evid. 702 ................................................................................................. 5

**Regulations:**

45 C.F.R. § 400.5(g). ....................................................................................... 2, 14

45 C.F.R. § 400.8 ................................................................................................. 9

45 C.F.R § 400.154 ............................................................................................... 2

45 C.F.R § 400.155 ............................................................................................... 2

**Other Authorities:**

U.S. Dep't of Health & Human Servs., Office of Refugee Resettlement, *Find Resources and Contacts in Your State*, *at* http://www.acf.hhs.gov/programs/orr/state-programs-annual-overview (last visited Jan. 25, 2016). ..................................................................................... 18

### INTRODUCTION

In November of 2015, Governor Pence announced that to protect the safety and security of all Hoosiers he was "suspending" the resettlement of Syrian refugees in Indiana. However, the Governor does not control the resettlement of refugees, and federally approved Syrian refugees have since been resettled in Indiana and will continue to resettle here. Now, Governor Pence and the other defendant in this case ("the State") have rebooted the concept of "suspend" and have announced that the state will use the federal funds it receives to pay for the refugees' direct financial, food, and medical assistance. However, ostensibly to protect Hoosiers from extensively federally vetted Syrian refugees, the State has determined that it will not pass through federal funds—to the extent those funds are used to serve Syrian refugees—to local refugee agencies. This is so despite assurances to the contrary in its agreements with the federal government and local refugee agencies.

While the State has numerous ways to inform the federal government of its opinion that the United States is not adequately pre-screening refugees or performing the other duties concerning refugees that are within the federal government's exclusive control and responsibility, crudely insinuating itself into the foreign and refugee policy of the United States is not one of them. The State's actions here are preempted both by statute and by the exclusive role that the federal government has in regulating immigration and conducting foreign affairs. This issue is appropriately raised by Exodus Refugee Immigration ("Exodus"), a non-profit agency that will lose funding as it strives to fulfill its mission to serve all refugees, including Syrians who are allowed into this country by federal authorities.  Exodus may also raise the obvious violations of both equal protection and Title VI of the Civil Rights Act of 1964 occasioned by the State's decision to deny federal monies that would otherwise be paid to

Exodus when Exodus serves Syrian refugees.

FACTS

**I.     The essential facts are uncontested and the State has conceded that it intends to deny Exodus necessary federal funding that passes through the State**

Pursuant to the Immigration and National Act, 8 U.S.C. § 1522, the State of Indiana has submitted its State Plan to the federal government to provide refugee assistance and that plan has been approved. (ECF No. 40 ¶ 43). The statute requires that refugee assistance "shall be provided to refugees without regard to race, religion, nationality, sex or political opinion."  8 U.S.C. 1522(a)(5); *see also* 45 C.F.R. § 400.5(g).  Under the State Plan, the federal government's Office of Refugee Resettlement provides monies to the State to be passed through the State for direct assistance to refugees. (ECF No. 41-6 ¶ 4).[1]  Federal funds are also provided to states with approved state plans to pass through to local resettlement agencies such as Exodus to provide various social services, including "cultural integration training, job skills training, adult English language training, and anything that can help the refugees adapt to their new communities, become employable, and become financially viable without public assistance."  (*Id.* ¶ 6; ECF No. 41-6 at 34; 45 C.F.R §§ 400.154, 400.155).   Indiana has agreed to provide these services "contractually through programs specifically designed to work with the refugee population." (ECF No. 41-6 at 34). Therefore, Exodus has a grant agreement with the State of Indiana to provide employment and social services to the refugees it serves, with the federal monies being used to provide direct services to clients as well as being used for staff and administrative costs.

---

[1]     The cash assistance, medical assistance, Refugee Medicaid and SNAP (Supplemental Nutrition Assistance Program) benefits that are paid to refugees are funded entirely by the federal government. (*Id.*  ¶¶ 6-9; 7 U.S.C. § 2013; 8 U.S.C. § 1522(e)).

(ECF No. 16-1 ¶¶ 25-27 and at 9-43).[2] Additionally, Exodus receives federal funds, passed through the State of Indiana, to provide health promotion services to its refugee clients. (ECF No. 16-1 at 45).

Pursuant to the Governor's directive to "suspend" the resettlement of refugees the State will, at this point, continue to pay direct assistance to the refugees, including Medicaid, cash assistance, and TANF. (ECF No. 41-1 ¶¶ 12-13).  However, the State will not pay Exodus any of the monies owed under the grants to provide employment and other social services to the extent that the services are provided to Syrian refugees. (*Id.* ¶ 11).

Exodus will be resettling Syrian refugees this year. (ECF No. 16-1 ¶ 8). Of the 890 refugees that it anticipates resettling, 215 are projected to be from North East/South Asia and this number will largely be made up of Syrian refugees. (*Id.*).  The loss of the social services grant monies for Syrian refugees that would otherwise be paid directly to Exodus will be very harmful to Exodus. (*Id.* ¶ 44).  It is a not-for-profit that cannot afford this loss of funding without serious negative repercussions on its ability to provide for all of the families that it serves. (*Id.*). To compensate for these loss of funds Exodus will have to take services away from other areas and this will put a strain on its ability to serve its refugee clients. (*Id.* ¶¶ 46-47).

## II.    The State's material concerning Syrian refugees is largely irrelevant and unreliable, and provides no support for the State's actions

Attached to the State's response are numerous exhibits, most of which are designed to support the State's argument that Syrian refugees are dangerous.  There are numerous problems with these evidentiary submissions.

First, many of them refer to Syrians in general, and not to those who have passed through

---

[2]        To receive reimbursement for these services Exodus and the other local agencies will each month submit to the State an itemized claim for services rendered to all refugees in the prior month.  (Schomburg ¶ 6).  The State will then make payment by drawing down on its allotted federal funds. (*Id.*)

the extensive vetting process to which Syrians seeking admission as refugees in the United States are subject.  These submissions, therefore, are not relevant to this case, which concerns those refugees.  Moreover, even if true, evidence concerning Syrian refugees is simply not relevant to Exodus's preemption claims, as the selection and admission of refugees is within the federal government's authority, not Indiana's.

Second, many of the submissions simply should not be considered as reliable evidence, even in a preliminary injunction proceeding.  "[A]lthough a court may grant a preliminary injunction based on less formal procedures and on less extensive evidence than a trial on the merits, for example, the court may rely on hearsay affidavits . . . there is no indication that unsworn statements and unauthenticated documents are sufficient." *D.U. v. Rhoades*, No. 13-CV-1457, 2015 WL 224932, at *4 (E.D. Wis. Jan. 15, 2015) (citing *Goodman v. Ill. Dep't of Fin. & Prof. Regulation*, 430 F.3d 432, 439 (7th Cir. 2005)).  Allowing such evidence to prove that the United States' review of refugees is deficient goes too far "even under the lax standards applicable in hearing motions for injunctive relief."  *Lazaro v. U.S. Dep't of Agric*, 186 F. Supp. 2d 1203, 1214 (M.D. Fla. 2001) (refusing to admit hearsay statement in a preliminary injunction hearing).  Therefore, the following should not be considered by this Court as support for the claim that dangerous Syrian refugees may slip through the United States' detailed vetting process:

- News media reports (ECF Nos. 41-7, 16, 17, 20, 23, 25-28, 41-42).

- Submissions to Congressional subcommittees and subcommittee reports. (ECF Nos. 41-9, 10, 12, 15, 18, 19).  "While a legislative report is a public record properly subject to judicial notice of its 'existence and contents, this does not mean that the court must accept the findings in the report as indisputable truth; the findings are merely evidence of the facts asserted.'"  *Alharbi v. Beck*, 62 F. Supp. 3d 202, 209 (D. Mass. 2014) (quoting *Stasiukevich v. Nicolls,* 168 F.2d 474, 479 (1st Cir. 1948)).  *See also, e.g.*, *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1370 (S.D. Fla. 2014); *In re Easysaver Rewards Litigation*, 737 F. Supp. 2d 1159, 1171 (S.D. Cal. 2010).

[4]

- An unverified scholarly article (ECF No. 41-13) that, absent some qualification of its authors as expert witnesses, is not admissible. *See* Fed. R. Evid. 701-702.

- An unverified complaint and indictment (ECF Nos. 41-21, 22). *See, e.g.*, *Aviation West Charters, Inc. v. United Healthcare Ins. Co.*, No. CV-14-00338-PHX-NVW, 2014 WL 5814232, *1 (D. Az. Nov. 10, 2014) (complaint's unverified allegations inadmissible).

In sum, the State's "evidence" fails to support its alarmist claim of the need to "protect[] Indiana residents from the well-documented threat of terrorism posed by a flood of inscrutable refugees fleeing Syria." (Dfts.' Mem. in Opp. [ECF No. 41] ["Defs. Mem."] at 41). Indeed, declarations obtained by Exodus from former high-level federal government officials with expertise in immigration and refugee policy and national security  state the exact opposite.

As noted in the declaration of Janet Napolitano, who has served as both U.S. Secretary of Homeland Security and Governor of Arizona, prospective refugees are limited to the most vulnerable—particularly women, children, survivors of violence and torture and those who are severely ill—and are subject to the highest levels of scrutiny and screening by first the U.N. High Commissioner for refugees and then by the U.S. Department of Homeland Security, the National Counterterrorism Center, the FBI's Terrorist Screening Center, the U.S. Department of State, and the U.S. Department of Defense. (Decl. of Napolitano ¶¶ 1-7, attached as Exhibit 1).  The process takes 18-24 months and occurs outside of the United States with additional screening at the point of entry before refugees are admitted to the United States. (*Id.* ¶ 7).[3]  These sentiments are echoed in the declaration of Ryan Crocker, whose long career in international affairs on behalf of the United States has included stints as U.S. Ambassador to Afghanistan, Iraq, Pakistan, Syria, Kuwait, and Lebanon, as well as the first Director of Governance for the

---

[3]      After the tragic attacks in Paris, which apparently motivated Governor Pence to make his "suspension" decision, former-Secretary Napolitano, along with former Secretary of Homeland Security Michael Chertoff, sent a letter to the President reasserting that the current refugee vetting process, described above, "is thorough and robust and, so long as it is fully implemented and not diluted, it will allow us to safely admit the most vulnerable refugees while protecting the American people. Fortunately, these goals are not mutually exclusive." (*Id.* ¶ 8 & Exhibit A).

Coalition Provisional Authority for Iraq, and a current position (since 2003) as International Affairs Advisor and faculty member at the National War College. (Decl. of Crocker ["Crocker"] ¶ 2, attached as Exhibit 2).  He also notes the rigor of the vetting process for potential refugees. (*Id.* ¶¶ 7-10 & Exhibit A).[4]

And, Doris Meissner, former Commissioner of the U.S. Immigration and Naturalization Service, has reviewed Indiana's concerns and notes in a declaration that in light of the fact that

> the refugee selection process involves the most rigorous screening of any program governing admission of noncitizens to the United States[] Indiana's concerns are unfounded and its objections to the resettlement of Syrian refugees will ultimately undermine the foreign policy and national security interests of our country which have been historically advanced by our government's refugee policies.

(Decl. of Meissner ¶ 4, attached as Exhibit 3).

Finally, the State's underlying argument that Syrian refugees have a particular potential for being dangerous terrorists represents a myopic view of today's world. The State cites to a report issued by the U.S. Department of State entitled "Country Reports on Terrorism 2014." (ECF No. 41-11). The report comments that a major trend "in global terrorism in 2014 included the Islamic State in Iraq." (*Id.* at 7).  It also mentions violent Sunni Islamist groups associated with al-Qa'ida operating in, among other places, Afghanistan. (*Id.* at 8).  And, "Iran continued to

---

[4]       Former-Ambassador Crocker notes that interfering with the resettlement of fully-vetted refugees in the United States ultimately is actually counterproductive to the security interests of all the United States.

Moreover, denying refuge to Syrians fleeing horror and violence in the Middle East is a counterproductive response in terms of U.S. national security.  In fact, ISIL is looking for proof that the West stands against Arabs and Muslims. As the bipartisan group of former top national security officials wrote: "refugees are victims, not perpetrators, of terrorism.  Categorically refusing to take them only feeds the narrative of ISIS that there is a war between Islam and the West, and that Muslims are not welcome in the United States and Europe, and that the ISIS caliphate is their true home. We must make clear that the United States rejects this worldview by continuing to offer refuge to the world's most vulnerable people, regardless of their religion or nationality."

(*Id.*  ¶ 13 & Exhibit B [December  2015 letter to congresspersons by former top national security officials including Secretaries of State, Secretaries of Defense, and National Security Advisors]).

[6]

sponsor terrorist groups around the world." (*Id.*).  Yet, among refugees who may be resettled in Indiana by Exodus are persons from Afghanistan, Iran, and Iraq. (ECF No. 40 at dep. pg. 57).  Today's world is potentially a dangerous place and, even if Indiana could legally get involved in choosing refugees, it makes little sense to burden Syrian refugees while ignoring refugees from other of the world's "hot spots." But, Indiana has no right to interfere with resettlement of, regardless of their countries of origin.

**ARGUMENT**

**I.    Exodus will prevail on the merits of its claims**

**A.    The State's denial of federal funding to Exodus for the federally approved Syrian refugees that it serves is preempted by federal law**

**1.   Exodus may enforce its preemption claims[5]**

The State argues first that Exodus "lacks a right to enforce federal laws supporting its preemption claims." (Defs. Mem. at 17-23).

a.    Notwithstanding the State's assertion to the contrary, Exodus's preemption claims are not precluded by the U.S. Supreme Court's recent decision in *Armstrong v. Exceptional Child Care, Inc.*, __ U.S. __, 135 S. Ct. 1378 (2015).  In *Armstrong*, the plaintiffs brought suit to challenge a state's Medicaid reimbursement rates, which they alleged to be inadequate under Section 30(A) of the Medicaid Act.  135 S. Ct. at 1382.  In rejecting the plaintiffs' attempt to enforce this provision through a preemption claim, the Court concluded that "the power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and that Congress had evinced an "intent to foreclose equitable relief" under Section 30(A).  *Id.* at 1385 (internal quotation omitted).  To reach this conclusion, as the

---

[5]    The State devotes a portion of its argument to insisting that Exodus lacks a private right of action to enforce the Refugee Act through 42 U.S.C. § 1983.  (Defs. Mem. at 18-20).  This portion of the State's argument, however, is responding to a claim that was never raised: Exodus has not brought its preemption claims pursuant to § 1983.

[7]

State acknowledges, the Court relied on two factors: *first,* Congress had created a remedy for the very wrong about with the plaintiffs were complaining, for the federal government was authorized to withhold Medicaid funds; *and second,* the text of Section 30(A) was "judicially unadministrable" insofar as the Court found it "difficult to imagine a requirement broader and less specific than § 30(A)'s mandate." *Id.* "The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy, shows that the Medicaid Act precludes private enforcement of § 30(A) in the courts." *Id.* (internal citation omitted).[6]

Here, Exodus has raised three preemption-based claims: a claim that the State's action is preempted by the exclusive federal role in regulating immigration and conducting foreign policy ("exclusive-authority preemption") (ECF No. 16 at 14-15, 17-20); a claim that the State's action is preempted by the manner in which Congress has occupied the field of immigration law in general and refugee resettlement in particular ("field preemption") (ECF No. 16 at 14-15); and a claim that the State's action is preempted by the fact that it stands as an obstacle to, and conflicts with, the objectives of Congress in enacting the Refugee Act ("conflict preemption") (ECF No. 16 at 15-16). The State, in asserting that Exodus lacks a right of action, does not distinguish between these claims, instead simply assuming that *Armstrong* is equally applicable at least to Exodus's field preemption and its conflict preemption claims.[7] However, *Armstrong* has no pertinence to the field preemption claim. After all, in evaluating whether Congress evinced an

---

[6] Since *Armstrong*, numerous courts have recognized these limitations on the Court's holding. *See, e.g.*, *Dye v. Kinkade*, No. 2:15-cv-04021-MDH, 2015 WL 7313424, at *6 (W.D. Mo. Nov. 19, 2015); *Planned Parenthood Southeast, Inc. v. Bentley*, __ F. Supp. 3d __, No. 2:15cv620-MHT, 2015 WL 6517875, at *6 (M.D. Ala. Oct. 28, 2015); *Tohono O'odham Nation v. Ducey*, __ F. Supp. 3d __, No. CV-15-01135-PHX-DGC, 2015 WL 5475290, at *10-11 (D. Ariz. Sept. 17, 2015); *Friends of East Hampton Airport, Inc. v. Town of East Hampton*, No. 15-CV-2246, 2015 WL 3936346, at *9 (E.D.N.Y. June 26, 2015), *appeal pending*, Nos. 15-2334 & 15-2465 (2d Cir.).

[7] It does not appear that the State believes *Armstrong* pertinent to Exodus's exclusive-authority preemption claim. After all, as Exodus demonstrated previously (*see* ECF No. 16 at 14-15, 17-18), the U.S. Constitution leaves to the federal government the exclusive authority to establish immigration policy and to regulate immigration, *see* U.S. Const. art. I, § 8, cl. 3-4, and to conduct foreign affairs, *see* U.S. Const. art. II. The standards of *Armstrong* are clearly inapposite to such a claim.

"intent to foreclose equitable relief" through the Medicaid Act, the *Armstrong* Court focused exclusively on the specifics of Section 30(A) and the manner in which that statute is enforceable by the federal government.  135 S. Ct. at 1385.  But this inquiry is wholly inappropriate to a field preemption claim, where a plaintiff's argument is based not on the violation of a specific statute but on a state's intrusion into a statutory arena in which it is forbidden to operate.  The U.S. Supreme Court has thus in the immigration context regularly resolved such claims in favor of plaintiffs without questioning whether those claims were properly before it.  *See, e.g.*, *Toll v. Moreno*, 458 U.S. 1 (1982); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948); *Truax v. Raich*, 239 U.S. 33, 36 (1915).  This authority was not even cited, let alone distinguished, in *Armstrong*.

*Armstrong* is also no impediment to Exodus's conflict preemption claim.  As indicated, the Court in *Armstrong* relied on two factors to determine that Section 30(A) was unenforceable as a preemption claim: the fact that Congress had authorized the federal government to withhold Medicaid funds, and the fact that the terms of Section 30(A) rendered it "judicially unadministrable."  *See* 135 S. Ct. at 1385 ("The provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief.  But it does so when combined with the judicially unadministrable nature of § 30(A)'s text.") (emphasis in original) (internal citation omitted).  Here, neither factor is met.  The statutory text relied upon by the State does not support its argument that the Refugee Act grants the federal government the authority "to withhold funding from states who break the rules."  (Defs. Mem. at 21).  Its only citation for this proposition is 8 U.S.C. § 1522(a)(7)-(8).  Section 1522(a)(7), however, merely gives the federal government the authority to monitor refugee assistance by evaluating the effectiveness of the State's programs, by engaging in financial auditing and fraud detection, and

[9]

by collecting data; and Section 1522(a)(8) only concerns the sharing of certain information between federal agencies. It is unclear whether federal regulations grant authority to the United States to withhold funding from states, *see* 45 C.F.R. § 400.12, although *Armstrong* of course focused on *congressional* intent.  What is clear is that the Refugee Act, unlike the Medicaid Act at issue in *Armstrong*, does not specifically allow the federal government to withhold funds based on a finding that the administration of a state plan failed to comply substantially with federal law, *see* 42 U.S.C. § 1396c. Regardless, this issue need not be resolved inasmuch as *Armstrong*'s second factor is clearly not met.

Unlike Section 30(A) the requirements imposed by the Refugee Act are not so broad and unspecific that it is rendered judicially unadministrable.  The State's assertion to the contrary consists of a single sentence: "[The Refugee Act] merely provides rules . . . to follow in determining refugee placement and imposes no obligation on states."  (Defs. Mem. at 21).  But this says nothing about the specificity of these rules.  Notwithstanding the State's assertion that these rules "impose[] no obligations on states," they explicitly prohibit discrimination in refugee assistance—*even by the State*—on the basis of "race, religion, nationality, sex or political opinion."  8 U.S.C. § 1522(a)(5).  That is the very antithesis of a statute that is "judicially unadministrable": it is a non-discrimination statute similar to a variety of statutes that courts at all levels enforce with great frequency.  On top of this non-discrimination obligation under the Refugee Act, the State is required to ensure that services it provides under its state plan "insure language training and employment services are made available to refugees receiving cash assistance," 8 U.S.C. § 1522(a)(6)(A)(ii)—another easily administrable provision that the State blatantly contravenes insofar as it has now withdrawn funding for refugee training and employment services without curtailing their cash assistance.  And the State is required to ensure

that it meets the priorities developed by the federal government for the "effective settlement of refugees." 8 U.S.C. § 1522(a)(6)(B). These priorities, of course, include the variety of factors that must be considered by the federal government in determining the placement of refugees. *See* 8 U.S.C. § 1522(a)(2)(C). After considering these factors, the federal government determined Indiana to be an appropriate placement for numerous Syrian refugees. Again, asking the judiciary to determine that the State's refusal to provide services to these persons stands as an obstacle to federal objectives does not require the application of indefinite standards that present problems of administration. Under *Armstrong*, even Exodus's conflict preemption claim is viable.

        b.     The State next argues at some length that Exodus may not enforce any other law—such as a treaty—that "forms the basis" for its preemption claims. (Defs. Mem. at 21-23). Its argument in this respect, however, misunderstands Exodus's preemption claims. Generally speaking, these claims assert that the state has impermissibly intruded into an arena of exclusive federal dominion, and the manner in which the State's action actually conflicts with international treaties merely underscores the federal nature of refugee resettlement. But this is a far cry from saying that Exodus is actually seeking to *enforce* international treaties. The Supreme Court has frequently allowed litigants to seek injunctive relief who argue that state action is preempted by federal authority without the Court considering whether the federal authority itself creates a right of action. *See Foster v. Love*, 522 U.S. 67 (1997) (concerning the dates of federal elections); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) (concerning ERISA); *Railroad Transfer Service, Inc. v. Chicago*, 386 U.S. 351 (1967) (concerning Interstate Commerce Act), *Campbell v. Hussey*, 368 U.S. 297 (1961) (concerning federal legislation regulating tobacco). By focusing

[11]

on a perceived attempt to *enforce* international treaties, the State's argument never gets off the ground.

In its initial brief, Exodus demonstrated that the State's action is preempted because it impacts directly on the United States' exclusive power in conducting foreign relations. (ECF No. 16 at 17-20). This is so because it is the President who has been given the constitutional authority to act in the areas of relations with other countries, and Congress that has been given a role through its war and foreign commerce powers. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003). Thus, as Exodus noted previously, state action that directly affects foreign relations is preempted even if it does not directly conflict with a treaty. (ECF No. 16 at 18 [citing *Zschernig v. Miller*, 389 U.S. 429, 441 (1968)]). Although state action that also conflicts with the United States' treaty obligations is even more clearly preempted, this is so simply because the conflict underscores the manner in which one state has impermissibly interposed itself into foreign affairs. However, this does not mean, as the State contends, that a plaintiff raising an exclusive-authority preemption claim is seeking to *enforce* an international treaty. Thus, in *Garamendi*, the Supreme Court did not hold that state action *violated* executive agreements concerning restitution to Nazi victims; it held that state action "interfere[d] with the foreign policy those agreements embody." 539 U.S. at 417. In *Zschernig*, the Court held that state regulations "must give way if they impair the effective exercise of the Nation's foreign policy . . . even in absence of a treaty." 389 U.S. at 440-41. And in *Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905 (S.D. Ind. 2011), Judge Barker held that a prohibition on the use of consular identification cards "directly interferes with rights bestowed on foreign nations by treaty" even though the provision "does not conflict with the [treaty]." *Id.* at 922.[8]

---

[8]     Given this distinction between enforcing treaty obligations and asserting that a state has impermissibly intruded into the federal domain, the State is left to argue that only individual refugees, and not Exodus, may raise

## 2. The State's action is preempted[9]

### a. The State's action runs afoul of the Refugee Act

When Indiana chose to participate in the Refugee Act resettlement program, it agreed to administer the federal funds "without regard to race, religion, nationality, sex or political opinion," 8 U.S.C. § 1522(a)(5).  But, by withholding funds for Syrians and only Syrians, the State's action does just that.  Therefore, it not only "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," but also means "compliance with both federal and state regulations is a physical impossibility."  *Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492, 2501 (2012) (citations omitted).  The State's action is therefore conflict-

---

its preemption claims.  (Defs. Mem. at 22-23).  Its sole support for this stunning proposition is *Wilderness Society v. Kane County*, 632 F.3d 1162 (10th Cir. 2011) (*en banc*), in which the Tenth Circuit held that an environmental organization lacked prudential standing—and thus did not address whether it even possessed Article III standing—to enforce federal land rights in certain routes in the Grand Staircase-Escalante National Monument.  As an initial matter, there is substantial doubt that prudential standing requirements are even applicable to a preemption claim: three circuits have held to the contrary.  *See Taubman Realty Group Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 n.3 (4th Cir. 2003) (A plaintiff "does not have to meet the additional standing requirement involving the zone of interests test with respect to its Supremacy Clause claim."); *PhRMA v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001) ("[A]n entity does not need prudential standing to invoke the protection of the Supremacy Clause."), *aff'd sub nom. PhRMA v. Walsh*, 538 U.S. 644 (2003); *St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands*, 218 F.3d 232, 241 (3d Cir. 2000) ("We know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption.").  It does not appear that prudential standing requirements have *ever* been extended to claims premised on a state's intrusion into foreign affairs.  Given that *Wilderness Society* stands on questionable footing regardless, prudential standing limitations should not be extended to preemption claims.

The court in *Wilderness Society* attempted to distinguish this line of cases by insisting that they resolved only the "zone of interests" prong of prudential standing analysis but that they "do not resolve another aspect of prudential standing, whether plaintiffs can assert the legal rights of others."  632 F.3d at 1170.  But even were this so, the court's holding merely underscores the uniqueness of that case.  In *Wilderness Society*, the plaintiffs' preemption claim was not merely an assertion that local action was preempted by federal enactments; it was an attempt to "enforce the federal government's property rights in the disputed rights of way."  *Id.* at 1171.  The State's argument here that Exodus may not raise its preemption claims because these claims "would inhere only in the refugees themselves" (Defs. Mem. at 22) ignores the nature of *any* preemption claim: to the extent that the "legal rights" at issue in a preemption claim are particular to any entity, they are always the rights of the United States.  But clearly parties other than the federal government may raise preemption claims, and there is no basis on which to distinguish between Exodus's right to raise its preemption claims and the right of refugees to raise similar claims.  The State's conclusory assertion cannot carry the day.

---

[9]     In responding to Exodus's preemption arguments, the State rarely distinguishes between the various preemption claims raised by Exodus.  This is important, for they are not co-extensive with one another.  To the extent possible, Exodus has attempted to ascertain which of the State's arguments pertain to which of Exodus's three preemption claims, and has noted as much below.

preempted in every sense of the term.

Nonetheless, the State insists that its unilateral action refusing to provide assistance to Syrian refugees does not run afoul of the Refugee Act.  (Defs. Mem. at 33-37).  This argument appears to address only Exodus's conflict preemption claim and not its field or exclusive-authority preemption claims.  The State argues simply that the text of the Refugee Act's nondiscrimination provision is addressed only to the federal government, and not to states that implement the refugee resettlement program.  But that is clearly not so.  The provision reads, in its entirety, as follows:

> Assistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion.

8 U.S.C. § 1522(a)(5). The provision is clearly targeted to the "[a]ssistance and services funded," and not to any particular entity that implements the program.[10]  This is made clear by 45 C.F.R. § 400.5(g) that specifically requires the state plan to make the assurance required by the statute.  Additionally, as noted above, the Refugee Act also requires the State to "insure that language training and employment services are made available to refugees receiving cash assistance."  8 U.S.C. § 1522(a)(6)(A)(ii).  Now that it has clarified the Governor's directive, this is precisely what the State is refusing to do: pass through money for job training while still providing TANF.[11]

---

[10]     By contrast, surrounding provisions of the Refugee Act are targeted at specific entities. *See, e.g.*, 8 U.S.C. § 1522(a)(4)(C) ("The Director may not . . ."); 8 U.S.C. § 1522(a)(6) ("[A] State must . . .").  It would be a curious statute that authorized states to discriminate with federal dollars simply because those dollars passed through state hands before reaching persons in need.  Not surprisingly, the statute does no such thing.

[11]     The State raises two additional arguments that do not require significant comment.  First, it insists that its refusal to provide assistance to Syrian refugees does not constitute discrimination against Syrians because a small number of such refugees might have actually been born elsewhere.  (Defs. Mem. at 35-36).  This argument is addressed above (although even the State's argument appears to concern "national origin" and not "nationality"). (*See infra* at I(B)(2)).  And second, the State attempts to find support for its action in the requirement of the Refugee Act that the federal government "consult regularly" with states and take a state's recommendations into account in placing refugees.  (Defs. Mem. at 33-34).  These provisions, however, do not change the fact that determining where to place refugees is ultimately the federal government's prerogative.

**b. Exodus's preemption claims are not "curbed" by any interest in protecting public safety**

The State next insists that its interest in protecting public safety "curbs the preemptive reach of federal law." (Defs. Mem. at 23-25). This is so, according to the State, because "when a State's action in an area of traditional state competence affects foreign relations, courts should 'consider the strength of the state interest, judged by the standards of traditional practice, when deciding how serious a conflict must be shown before declaring a state law unconstitutional.'" (*Id.* at 23-24 [quoting *Garamendi*, 539 U.S. at 420]). The State's reliance on Justice Harlan's concurring opinion in *Zchernig*, as well as on the Supreme Court's decision in *Garamendi*, appears to indicate that this argument concerns only Exodus's exclusive-authority preemption claim, and does not concern its statutory preemption claims. Nonetheless, there are three problems with the State's argument that combatting terrorism is an area of traditional state competence that "curbs" the reach of Exodus's preemption claims.

First, although the State rests its argument on the notion that screening refugees for potential threats to security is an area of "traditional state competence," this is simply—and quite clearly—not so. As indicated repeatedly, the federal government has in place extensive mechanisms, including the years-long evaluation by several agencies, to ensure that refugees do not present a threat to the United States. For this reason, federal law instills the federal government with the right to respond to international refugee crises, to grant refugee status to particularly individuals, and to determine the appropriate placement of refugees within the United States. *See, e.g.*, 8 U.S.C. §§ 1157(b), 1522(a)(2). And Exodus cited previously a wide range of authority establishing the federal government's authority and primacy over immigration policy. (*See* ECF No. 16 at 14-15). Against all this, the State offers simply its assertion— relying on jurisprudence from the first half of the 19th century—that states previously were

[15]

responsible for screening immigrants for disease. To say the least, the balance of power between the federal government and the states has shifted dramatically over the past two centuries, and the authority on which the State relies is of highly questionable import. But regardless, a traditional state role in screening immigrants for disease clearly does not equate to "traditional state competence" in assessing whether international refugees present a security threat. Nowhere is this more clear than in the Governor's announcement of the suspension of the resettlement of Syrian refugees itself: the Governor did not demand a role in assessing the safety of refugees but instead demanded "assurances *from the federal government* that proper security measures have been achieved." (ECF No. 41-36 [emphasis added]). This is a clear recognition of the self-evident: screening immigrants for a potential threat to security is exclusively within the competence of the United States, and the State offers nothing to suggest to the contrary.[12]

Second, even Justice Harlan's *Zschernig* concurrence rests not only on whether an area is one of "traditional state competence," but also on the "incidental" nature of any "effect on foreign relations." 389 U.S. at 459. Thus, apart from the treaty obligation at issue in that case, Justice Harlan indicated that there was "no specific interest of the Federal government which might be interfered with by this statute [regulating property distribution]." *Id.* That, however, stands in stark contrast to the present case, where—as described repeatedly—the United States has an undeniably weighty interest in responding to an international refugee crisis.

---

[12]     The State also cites *Garamendi*, 539 U.S. at 420, for the principle that the State's "traditional police powers" extend to "protect[ing] its citizens from the threat of terrorist violence." (Defs. Mem. at 24). This citation is misleading and is not well-taken: *Garamendi* says no such thing. To the contrary, the Court in *Garamendi* underscored the federal government's "responsibility for foreign affairs," noting that,

> [s]ince claims remaining in the aftermath of hostilities may be sources of friction acting as an impediment to resumption of friendly relations between the countries involved, there is a longstanding practice of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries.

539 U.S. at 420 (internal citations and quotations omitted). This holding, of course, is just as applicable to the United States' response to an international refugee crisis and to the hostilities abroad that resulted in this crisis.

And third, although the State insists that states "may 'act in areas of their traditional competence even though their [actions] may have an incidental effect on foreign relations'" (Defs. Mem. at 23 [quoting *Zschernig*, 389 U.S. at 459 (Harlan, J., concurring in result)]), it has curiously omitted material language from Justice Harlan's *Zschernig* concurrence.  In reality, Justice Harlan would have held as follows:

> [I]n the absence of a conflicting federal policy or violation of the express mandates of the Constitution the States may act in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations.

389 U.S. at 458-59 (Harlan, J., concurring in result) (emphasis added).  Here, Exodus has repeatedly cited the clear federal policy at conflict with the State's actions.  The Constitution instills the President and Congress with authority to act in areas of foreign affairs and to establish immigration law and policy.  In exercise of these powers, not only has the federal government, applying the standards established by 8 U.S.C. § 1522(a)(2)(C), determined Indiana to be an appropriate placement for Syrian refugees, but Congress itself has prohibited nationality-based discrimination in the refugee resettlement process as well as prohibited the withholding of language training and employment services from refugees receiving cash assistance.  The State first omits and then ignores the actual standard advocated by Justice Harlan.[13]

### c.  The State is not saved by what it characterizes as its "temporary and limited" refusal to support Syrian refugees

---

[13]     As a strictly legal matter, it is worth reiterating that the State's entire argument derives from the standard advocated by Justice Harlan in *Zschernig*.  While this standard was "[g]enerally" accepted by Justice White in dissent, 389 U.S. at 462 (White J., dissenting), it was not accepted by any other Justice in that case; in *Garamendi*— the State's assertion to the contrary notwithstanding (Defs. Mem. at 23)—the Court described the different views of preemption embodied by the *Zschernig* opinions but decided that "the question requires no answer here" insofar as the California statute regulating Holocaust-era insurance claims was preempted "even on Justice Harlan's view," 539 U.S. at 418-20.  Of course, Exodus acknowledges that, when a party claims statutory-based field preemption, "the historic police powers of the States [are] not to be superseded by [federal statutes] unless that was the clear and manifest purpose of Congress" *United States v. Locke*, 529 U.S. 89, 108 (2000).  The Court in *Locke*, however, cited neither *Zschernig* nor *Garamendi*, and this holding therefore does not appear applicable to a preemption claim premised on the constitutional authority of the federal government.  Regardless, because of the limitations on Justice Harlan's would-be holding described above, as in *Garamendi* this issue requires no answer here.

The State next argues at length that its "temporary and limited" refusal to pass along federal money that it has accepted for the purpose of refugee resettlement somehow saves its actions.  (Defs. Mem. at 25-33).  The irony of this argument cannot be ignored: on the one hand, the State is insisting that Syrian refugees present such a significant threat to security that it must act in the interest of public safety; on the other hand, it is arguing that its own actions are so minor that they do not significantly affect refugee resettlement.  Its arguments are in error.

1.      As an initial matter, by characterizing its refusal to allow federal monies to be "passed through" to Syrian refugees that have been resettled in Indiana as "temporary and limited," the State significantly understates the import of its actions.  For one, it is not at all clear what the State intends by characterizing its refusal as "temporary," for it suggests no time when it will again provide assistance; although of course even temporary illegal action is still illegal action.  Moreover, an individual unfamiliar with refugee resettlement who is reading the State's brief for the first time would be left with the impression that its actions have neither national nor international repercussions.  This is not so.  Every state in the nation participates in refugee resettlement, through a state plan program (as in Indiana) or through Wilson-Fish (a grant program discussed by the State) or a separate public-private partnership (both of which also rely on refugee assignments from the national voluntary agencies).  *See* U.S. Dep't of Health & Human Servs., Office of Refugee Resettlement, *Find Resources and Contacts in Your State*, *at* http://www.acf.hhs.gov/programs/orr/state-programs-annual-overview  (last  visited  Jan.  25, 2016).  However, contrary to the State's tacit assertion, once it refuses to provide assistance to Syrian refugees, those refugees may not receive assistance through any other program recognized under federal law insofar as Indiana has a state plan under the Refugee Act: a Wilson-Fish plan may only exist in a state that has *not* opted in to the Refugee Act, *see* 8 U.S.C.

[18]

§ 1522(e)(7) (describing Wilson-Fish as an "alternative project[]).

In effect, the State has decided unilaterally that it will not respond to an international refugee crisis.  But, once more, Indiana cannot attempt by itself to conduct foreign affairs.  The humanitarian concerns resulting from Syria's civil war are, of course, undeniable, and the international ramifications of the refugee crisis are complex. The State significantly understates the international repercussions of the United States' response to this crisis, which affects nations throughout an entire region.  As noted previously, "[n]o State can rewrite our foreign policy to conform to its own domestic policies.  Power over external affairs is not shared by the States; it is vested in the national government exclusively."  *United States v. Pink*, 315 U.S. 203, 233 (1942).  It is not for the State to determine what constitutes "limited" or "temporary" action.

2.     In insisting that its "limited" refusal to allow federal monies to be used to support Syrian refugees saves its action from preemption, the State relies most significantly on *Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013), *cert. denied*.  In that case, a divided panel of the Eighth Circuit upheld against a preemption challenge a city ordinance regulating the rental of property to undocumented immigrants.  *Id.* at 939-45.  As an initial matter, *Keller* should not be followed: it has been explicitly rejected by two circuits, *see Valle de Sol Inc. v. Whiting*, 732 F.3d 1006, 1025-26 & n.18 (9th Cir. 2013), *cert. denied*; *Lozano v. City of Hazleton*, 724 F.3d 297, 317 n.26 (3d Cir. 2013), *cert. denied*, and prior to the Eighth Circuit's decision two additional circuits reached contrary conclusions in challenges to similar ordinances, *see United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013); *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1263-66 (11th Cir. 2012).  *See also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) (*en banc*).

More importantly, neither *Keller* nor the State does justice to the careful balancing struck

[19]

by the nation's immigration laws.  Exodus previously detailed the requirements of the Refugee Act—including the factors that must be taken into consideration before determining where to resettle an international refugee—and cited numerous cases establishing the federal government's primacy over immigration law and policy.  The State attempts to distinguish the present case from the authority on which Exodus previously relied by insisting that this authority "mostly invoke[d] particular federal statutes and commitments, not merely the broad import of a multi-faceted federal program."  (Defs. Mem. at 26).  The State's meaning is not altogether clear, particularly given the uncertainty inherent in the word "mostly": in its previous brief Exodus relied upon the Immigration and Nationality Act (as amended by the Refugee Act) and specific treaty obligations of the United States, and the State does not explain why these do not constitute "particular federal statutes and commitments."  But the notion that state action must violate a "particular" statute in order to be preempted—which, as explained repeatedly, the State's action here does—simply refuses to accept the doctrine of field preemption, where state law is displaced by "a framework of [federal] regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona v. United States*, 132 S. Ct. at 2501 (internal quotations, alterations, and citation omitted).  In *Arizona*, for instance, the Court did not focus on specific statutory provisions but instead focused on "[t]he pervasiveness of federal regulation" in order to invalidate a state attempt to legislate in the immigration field.  *Id.* at 2500.  And in addressing particular statutory provisions, the Court found preemption because they intruded "on the field of alien registration" (*id.* at 2501), stood "as an obstacle to the federal plan of regulation and control" (*id.* at 2503), and served as "an obstacle to the removal system Congress created" (*id.* at 2505).

3.      Not satisfied with this, the State insists that its decision to suspend assistance to Syrian refugees is "consistent with federal policy."  (Defs. Mem. at 28-30).  This is a curious argument, for the United States has determined it appropriate to place Syrian refugees in Indiana and has expressly forbidden nationality-based discrimination in the refugee resettlement process.

The State's argument is premised on its assertion that refugee resettlement is a state plan program from which it could opt out entirely if it chose.  This argument, however, goes nowhere: the State has *not* opted out.  "[O]nce a state opts in [to a state plan program], it must abide by [federal] laws and regulations."  *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 24 (D. Mass. 2006) (citations omitted) (addressing the Medicaid Act).  The State's argument may not be reconciled with the Supreme Court's decision in *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992).  In *Gade*, the Court addressed the preemptive effect of the federal Occupational Health and Safety Act ("OSHA") on state attempts to regulate occupational safety.  *Id.* at 98-99. Through OSHA, Congress authorized the Secretary of Labor to set standards for occupational safety, *id.* at 96, but allowed states to preempt federal regulation entirely by submitting its own state plan to the Secretary of Labor for approval, *see id.* at 97.  However, states' ability to opt out of federal requirements by submitting their own state plan did not immunize Illinois's attempt to regulate occupational safety from a preemption challenge when it had not followed that process: "nonapproved state regulation of occupational safety and health issues for which a federal standard is in effect is impliedly pre-empted as in conflict with the full purposes and objectives of [federal law]," and "a State may not enforce its own occupational safety and health standards without obtaining the Secretary's approval."  *Id.* at 98-99.  The fact that the states could opt *out* of federal requirements in *Gade* by submitting a state plan whereas here they can opt *in* to federal requirements by submitting a state plan is clearly of no consequence.  Accordingly, the

[21]

Court has routinely resolved preemption challenges even when the underlying program was a state plan program that the states could choose not to sign onto.  *See, e.g.*, *Armstrong*, *supra* (Medicaid); *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, __ U.S. __, 132 S. Ct. 1204 (2012) (Medicaid); *Chapman v. Houston Welfare Rights Organ.*, 441 U.S. 600 (1979) (Social Security).

Against all this, the State is left to focus on two factors.  First, it notes that a separate grant program (Wilson-Fish) exists that allows for assistance with refugee resettlement in states where no state plan has been submitted and approved.  (Defs. Mem. at 28).[14]  As noted immediately above, this is simply not relevant to Exodus's preemption claims: the State has submitted a state plan that has been approved by the federal government, and the fact that a different program exists that might (and might not) have received federal approval is of no import.  The State's argument thus never gets off the ground.  And second, the State insists that the United States has "no apparent policy that any particular number of Syrian refugees be resettled in Indiana."  (Defs. Mem. at 29).  Again, it is not clear what this has to do with preemption.  The federal government, applying the factors enumerated in 8 U.S.C. § 1522(a)(2)(C), has determined Indiana to be an appropriate placement for numerous Syrian refugees.  The fact that it has not established a "policy"—to use the State's verbiage—dictating ahead of time the precise number of refugees of each nationality that will be resettled in each state is simply evidence of the complexity of refugee resettlement.  The complexities are resolved at the national and international levels; they are not to be resolved at the state level.[15]

---

[14]     The State characterizes this program as "award[ing] grants to private entities."  (Defs. Mem. at 28).  However, it is clear that the grants may be, and sometimes are, awarded to state agencies as well.  *See* U.S. Dep't of Health & Human Servs., Office of Refugee Resettlement, *Wilson-Fish Chart*, Jan. 25, 2013, *at* http://www.acf.hhs.gov/programs/orr/resource/wilson-fish-chart (last visited Jan. 25, 2016) (noting state agency administrators at least in Colorado, Kentucky, and Massachusetts).

[15]     Citing a document available on the webpage of the U.S. Department of State (ECF No. 41-3), the State insists that determinations to resettle refugees in states are "made by Voluntary Agencies."  (Defs. Mem. at 29).  That is a mischaracterization of the document on which the State arrives.  This document indicates simply that, under the guidance of the Bureau of Population, Refugees and Migration of the U.S. Department of State, voluntary

The State, in a related argument, then asserts that its actions are saved from Exodus's preemption claims by virtue of the anti-commandeering principles of the U.S. Constitution (Defs. Mem. at 31-33); it then reiterates this assertion as a Tenth Amendment argument (*id.* at 37).  But, as above, the State may not claim that it is injured by a requirement that it abide by regulations governing a program in which it has voluntarily decided to participate.  The anti-commandeering doctrine generally prohibits the federal government from "compel[ling] the States to implement, by legislation or executive action, federal regulatory programs."  *Printz v. United States*, 521 U.S. 898, 925 (1997).  However, it does not prohibit states from conditioning funding on compliance with federal objectives.  *See, e.g.*, *Nat'l Fed. of Indep. Business v. Sebelius*, __ U.S. __, 132 S. Ct. 2566, 2601-02 (2012).  "The conditions imposed by Congress ensure that the funds are used by the States to 'provide for the general Welfare' in the manner Congress intended."  *Id.* at 2602 (alteration omitted).  The State's anti-commandeering argument is premised on the notion that Exodus is seeking to require the State to participate in refugee resettlement.  But this is not the case: it is the State itself that has decided to participate in the program and has submitted a state plan for providing refugee assistance.  Acting on this decision, the federal government has decided to respond to an international crisis by placing Syrian refugees, among others, in Indiana.  The State may not insist that requiring it to provide federal monies that pass through the State to refugees resettled in Indiana because of its own decision to participate in the program somehow runs afoul of the anti-commandeering doctrine.

**B.      The State's denial of federal funding to serve federally approved Syrian refugees violates both equal protection and Title VI of the Civil Rights Act**

---

agencies "prepare eligible refugee applications for U.S. resettlement consideration."  (ECF No. 41-3 at 1).  It says nothing about the actual determination of where a refugee will resettle.  What is clear is that it is the federal government that is responsible for determining the placement of approved refugees.  *See* 8 U.S.C. § 1522(a)(2)(B)-(C).  Even were this not so, however, the State does not explain why it believes it pertinent that the United States allows input from national agencies: regardless of who makes this determination, it is made at the federal level.

1.      **Exodus has standing to raise its equal protection and Title VI claims**

a.  **Both Exodus and the Syrian refugees are damaged by the State's actions**

The State is planning to reduce the amount of federal monies that it has committed to pay to Exodus for educational and social services. "The loss of funds promised under federal law" is "injury in fact" that affords Exodus standing. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 965 (9th Cir. 2015), *pet. for cert. docketed*, No. 15-467 (2015).  It is also uncontested that this loss of funds will cause "severe repercussions on [Exodus'] ability to provide for the families it serves," causing a strain on Exodus's ability "to serve its population of refugees from Syria and other countries." (ECF No. 16-1 ¶¶ 44, 46).  It will also injure refugees as Exodus will necessarily receive less money with which to provide assistance to them. Somewhat surprisingly, the State argues (Defs. Mem. at 39), that there is no injury to the Syrian refugees because the refugees can be resettled elsewhere.  However, the evidence is that the Voluntary Agencies with whom Exodus works, and with whom Exodus has contracts, will be resettling refugees here with Exodus.  (ECF No. 16-1 ¶¶ 23-24, 40).  These refugees may very well have relatives, or ties,  in the Indianapolis area so that not being able to resettle here would be very problematic. (*See* ECF No. 41-39 at dep. pg. 62 [discussing "tie" and "free" cases]).  Moreover, requiring a family to suffer more relocations and more resettlement is clearly harmful.  The bottom line is that the State of Indiana has determined to treat refugees differently depending on whether they are Syrian or not by denying funding to the agencies that exist solely to smooth their transition to their new lives.  The refugees are therefore faced with injury.

b.  **Exodus has standing to raise the equal protection claims here**

Therefore, both Exodus and the Syrian refugees face injury.  Nevertheless, the State argues that Exodus does not have standing to raise the obvious constitutional and statutory

injuries here because it cannot raise the injuries of third parties—Syrian refugees who will be faced with diminished services caused by the lack of funds to Exodus.  The State errs. It is, of course, true that as a general matter federal courts do not let a litigant raise the rights of a third party, even if that litigant has suffered injury satisfying Article III standing requirements. *Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011) (citing *Singleton v. Wulff*, 428 U.S. 106, 112-13 (1976)).  This is a prudential limit on jurisdiction, *Warth v. Seldin,* 422 U.S. 490, 509 (1975), seeking to restrict the plaintiff's grievance to the "zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit," *Bennett v. Spear*, 520 U.S. 154, 162 (1997).  Given that this is a prudential, as opposed to constitutionally mandated, limitation, the rule can be modified under a number of circumstances that are met here.

### i.   The three-part test of *Singleton* demonstrates that Exodus has standing to raise the refugees' constitutional claims

In *Singleton*, the Court noted that a litigant has standing to raise a third-party's claims if the interests of the litigant and third-party are closely linked, the litigant is an effective proponent of the right, and there are obstacles to the third-party asserting its rights. 428 U.S. at 114-15.  The interests of Exodus and its refugee clients are closely linked and Exodus is an effective proponent of its rights and those of its clients. It is true, as noted by the State (Defs. Mem. at 38), that a former prison physician does not share a sufficiently close relationship with current prisoners to raise their claims.  *Massey v. Helman*, 196 F.3d 727, 741 (7th Cir. 1999). However, this has no bearing on the ongoing relationship between Exodus and its refugee clients who will be injured in the future.  *See, e.g.*, *Kaahumanu v. Hawaii*, 682 F.3d 789, 798-97 (9th Cir. 2012) (event planners had standing to raise rights of future clients concerning constitutional challenges to permit requirements regulating "commercial weddings" on public beaches in Hawaii).

It is clear that "a party need not face insurmountable hurdles to warrant third-party

standing." *Pennsylvania Psych. Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (citing *Powers v. Ohio*, 499 U.S. 400, 415 (1991)) (footnote omitted).  Obviously, a newly arrived refugee family, possibly with limited English-language proficiency, without knowledge of judicial remedies, and with a natural-desire to "lay low" and avoid attention will have practical obstacles to initiating litigation. This is particularly true given that public knowledge of the family's origin may very well provoke the type of fears of terrorist activity noted by the Governor in this case and may, in turn, prompt threats or violence from members of the public. *See, e.g.*, *id.* (privacy concerns of mental health patients and stigma associated with mental illness was sufficient obstacle justifying third-party standing); *Council of Ins. Agents & Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1309 (N.D. Fla. 2003) (inability of employees to finance litigation and fear that they might suffer reprisals was sufficient obstacle justifying third-party standing).  The basic requirements for third-party standing are met.

### ii. A business has standing to raise legal claims of potential clients when governmental actions affect the clients and injure the business, and under this principle Exodus clearly has standing

Consistent with the general rule set out in *Singleton* courts have established that a business or organization has standing to raise the claims of its customers or clients when the challenged actions restrict the clients and thereby injure the business. Thus, in *Craig v. Boren*, 429 U.S. 190 (1976), the Court found that a state statute that prohibited the sale of 3.2% beer to males under the age of 21, but that allowed the sale of such beer to females over the age of 18, was unconstitutional.  The Supreme Court concluded that an alcohol vendor had standing to raise the claim that the statute violated the equal protection rights of males between the ages of 18 and 21. *Id.* at 192-96.  The Court noted that the vendor was suffering "direct economic injury through the constriction of her buyers' market" or through the loss of licensure if she disobeyed the

statutory limitations. *Id.* at 194.  This injury gave the vendor the right to assert the constitutional interests of her potential male customers whose rights were being violated by the statute. *Id.* at 195. "Accordingly, vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* (citing cases).

Therefore, in *Rothner v. City of Chicago*, 929 F.2d 297 (7th Cir. 1991), a Chicago distributor and operator of video games was allowed to challenge an ordinance that prohibited minors from playing the games during school hours on days school was in session. *Id.* at 298. This had an adverse effect on Rothner's business and he sued claiming that the ordinance violated his customers' rights. The Seventh Circuit, in finding that Rothner had standing, noted that "when the interests of the litigant and the third party are closely related, the courts have viewed quite charitably assertions of third-party standing." *Id.* at 301 (citing *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), for the principle that private schools may assert parents' rights to send children to school when the "schools . . . had substantial property interests at stake").

These principles apply equally to non-profit corporations that suffer injury because of unconstitutional actions directed at their clientele.  Thus, in *Hudson Valley Freedom Theater, Inc, v. Heimbach*, 671 F.2d 702 (2d Cir. 1982), a non-profit organization that produced theatrical and artistic productions aimed at Black and Hispanic communities was able to allege that its denial of funding was because of unconstitutional racial discrimination. "When a corporation meets the constitutional test of standing . . . prudential considerations should not prohibit its asserting that defendants, on racial grounds, are frustrating specific acts of the sort

which the corporation was founded to accomplish." *Id.* at 706.[16]

### iii. Exodus has standing under the principles of *Havens*

Exodus's standing is also demonstrated by *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and its progeny.  In *Havens*, the Court held that an organization that existed to advocate for equal housing opportunity had standing to sue for a Fair Housing Act violation because the alleged practices frustrated its purpose and required it to devote it resources to combat the racially discriminatory practices. "[S]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes" injury in fact. *Id.* at 379.  Here, Exodus is threatened with both a loss of funding and the concomitant need to devote its limited resources to try to compensate for that loss.

*Havens* does not just provide a means to demonstrate injury—it provides a mechanism to allow an organization to challenge unlawful or unconstitutional actions that are directed toward the persons it serves.  For example, in *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008), the court found that the Indiana Democratic Party had standing to challenge Indiana's voter-identification statute:

> Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise by discouraged by the new law from bothering to vote. See *Havens* . . . . The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury . . . . The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law.

*Id.* at 951.  Based on this principle numerous cases have recognized that groups that work with

---

[16]    "This rule is based on the uncontroversial principle that it is unconstitutional for a state actor, motivated by discriminatory animus, to interfere with an individual's rights to contract or associate with members of a protected class." *Thorncreek Apartments III, LLC v. Village of Park Forest*, 970 F. Supp. 2d 828, 840 (N.D. Ill. 2013).

refugees or immigrants and that will have to expend organizational resources they would not have otherwise had to expend because of actions injuring the refugees or immigrants have standing to challenge those actions. For example, in *El Rescate Legal Servs., Inc. v. Executive Office of Immigration Review*, 959 F.2d 742 (9th Cir. 1991), an organization established to assist Central American refugees in their efforts to obtain asylum was deemed to have standing to challenge an alleged policy of the government of failing to provide full translation services in deportation and exclusion hearings. *Id.* at 745, 748. The court concluded that the organization had standing under *Havens* as the challenged policy frustrated the organization's goal of assisting their clients and "require[d] the organizations to expend resources in in representing clients they otherwise would spend in other ways is enough to establish standing." *Id.* at 748.[17]

As noted, the State's actions here will both deny Exodus funding and force it to divert its limited resources to attempt to compensate for the loss of funding. Clearly, Exodus has standing to challenge the State's actions that frustrate and hinder its basic organizational purposes.

### c. Exodus has standing to pursue the Title VI claim

In arguing that Exodus cannot pursue a Title VI claim the State argues that Exodus does not have standing because Title VI does not permit third-party rights claims, citing the Seventh Circuit's decision in *Simpson v. Reynolds Metals Co., Inc.*, 629 F.2d 1226, 1235 (7th Cir. 1980). In *Simpson* the plaintiff argued that his discharge from employment for alcohol-related issues violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The court concluded that he was not the intended beneficiary of federal financial assistance and could not use § 504. In

---

[17]     *See also, e.g., Georgia Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1259-60 (11th Cir. 2012) (standing for organization providing services to immigrant populations because challenged statute would require diversion of limited organizational resources); *Hispanic Interest Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1240 (11th Cir. 2012) (same); *We Are America/Somos America, Coalition of Ariz. v. Maricopa Cty. Bd. of Supervisors,* 809 F. Supp. 2d 1084, 1098-99 (D. Ariz. 2011) (same); *Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma*, 644 F. Supp. 2d 1177, 1195 (N.D. Cal. 2009) (same).

passing the court analogized § 504 to Title VI and stated that "[t]he legislative history of Title VI also lends strong support to the conclusion that Congress did not intend to extend protection under Title VI to any person other than an intended beneficiary of federal financial assistance." *Id.* (footnote omitted).  This case, and the others cited by the State, stands for the unremarkable proposition that in order to have standing a plaintiff alleging a Title VI claim must be within the zone of interests protected by the statute.

The Seventh Circuit has made it clear that this zone extends to those who seek to participate in the federally funded activity as well as those who are the direct beneficiaries of the funding.  In *City of Chicago v. Lindley*, 66 F.3d 819 (7th Cir. 1995), the court allowed the City of Chicago to maintain a Title VI claim, among other reasons, "because it is representing the interests of its individual citizens who have been harmed.  We agree that the City has standing to raise this claim." *Id.* at 828 n.11.  The court noted that the interests of the City as a recipient of federal monies to provide services through its Chicago Department on Aging "was within the zone of interests protected by  . . . Title VI, thus conferring direct standing upon it." *Id.*

> As the Fourth Circuit has noted:
>
> Title VI does not require that an injured party be the intended beneficiary of federal funds.  Instead, Title VI provides that no person shall "be excluded form participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race. 42 U.S.C. § 2000d. Thus, the determinative inquiry in this regard is whether [plaintiff] alleged that it suffered injury based on race discrimination and was either participating or seeking to participate in a federally funded activity, or was the intended beneficiary of those federal funds.

*Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 716 (4th Cir. 2014).  Clearly, Exodus, a participant in a federally funded activity, is being injured because of the State's discriminatory conduct.  Exodus is within the zone of interests of Title VI and has standing to proceed with its claim.

## 2.     The State is discriminating on the grounds of nationality and/or national origin

The State argues that the Governor's decision to withhold the federal monies to agencies for services provided to Syrian refugees does not discriminate on the basis of national origin because it does not target Syrians, but only refugees who have fled Syria "regardless of the refugee's race, religion, ethnicity, place of birth, or ancestry." (ECF 16-1 ¶ 9). As support, the State notes that of the 33 Syrian refugees who came into Indiana, or were at one time scheduled to arrive in Indiana, two persons were not born in Syria.  The factual point being made here is not clear—these two persons could have been born during a temporary absence from Syria.[18] However, they are identified as Syrian precisely because they were living in Syria when they became refugees.

In any event, the State can cite no authority for the proposition that discrimination against persons based on where they are coming from is not national origin discrimination.  To the contrary, discriminating against someone because they come from a particular country is plainly discrimination based on national origin.  *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 89 (1973) (explaining that the term "national origin" includes discrimination based on "the country from which you or your forbears came") (internal quotation marks and citations omitted) (referring to Title VII).  The refugees are all from Syria.  Case law is clear that no matter whether termed discrimination based on nationality or national origin, strict scrutiny applies. *See Graham v. Richardson,* 403 U.S. 365, 371 (1971) (classifications based on "nationality . . . are inherently suspect and subject to close judicial scrutiny"); *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015) (strict scrutiny applies to discrimination based on "national origin").

### 3.     The State's actions violate equal protection and Title VI

---

[18]     The State appears to be offering a distinction between national origin (those born in Syria) and nationality (those who are citizens of Syria). As noted immediately below, this distinction is not recognized by the law.

The State's policy applies to Syrians. The policy discriminates based on national origin and nationality and this discrimination can be justified only if strict scrutiny is met, requiring the State to demonstrate a narrowly tailored response furthering a compelling governmental interest. *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005) (setting out strict scrutiny standard); *Graham*, 403 U.S. at 372. However, the State contends that its targeting of Syrian refugees and the Indiana agencies that help them "is justified by a compelling interest in protecting Indiana residents from the well-documented threat of terrorism posed by a flood of inscrutable refugees fleeing Syria." (Defs. Mem. at 41). There is, of course, no competent evidence supporting this alarmist metaphor.[19] It is the State's burden to demonstrate that there is an actual problem that is being addressed by it actions and its conclusory statements are simply not sufficient. *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 822 (2000). The State has not demonstrated that there is a flood of terrorists seeking admission into Indiana under the guise of refugees.

Even if an actual problem was demonstrated, the State bears the burden of demonstrating that what it has done is in fact a narrowly tailored response. The State argues that its response is narrowly tailored "because U.S. officials have already acknowledged that they cannot distinguish actual refugees fleeing the Syrian civil war from Islamic State terrorist refugees." (Defs. Mem. at 42). The State cites, once again, to something that is not admissible. More importantly, if the State believes that there are terrorists sneaking into Indiana and that its ability to act in this area is not preempted, as it appears to believe, then it should do something to investigate individuals that prompt this suspicion, rather than impose a blanket rule "meant to deter, temporarily, resettlement of [all] Syrian refugees in Indiana." (Defs. Mem. at 42). Such a scattershot

---

[19]      Moreover, given that the State, at least at this juncture, is not interfering with the direct aid to Syrian refugees, but only stopping monies that go to refugee agencies for social and educational services, it is unclear how the State believes that its efforts will stem the apocryphal "flood."

approach is the antithesis of narrow tailoring.  The State is violating equal protection.[20]

On the substance of Exodus's Title VI claim the State argues that because the termination of funding that would otherwise be paid for the benefit of Syrian refugees does not violate equal protection it does not violate Title VI.  Exodus agrees that the Title VI claim here is coextensive with the equal protection claims. *See, e.g.*, *Grutter v. Bollinger,* 539 U.S. 306, 343 (2003).  As noted above, the State's policy violates equal protection.  It violates Title VI as well.

## II.    The other requirements for the grant of a preliminary injunction are met here

### A.  Exodus faces irreparable harm for which there is no adequate remedy at law

The State argues that Exodus has not demonstrated irreparable harm for which there is no adequate remedy at law in that all it is going to suffer is a loss of funding and this solely monetary argument does not amount to irreparable harm.  The State errs.

As Exodus noted in its earlier memorandum (ECF No. 16 at 25), a plaintiff threatened with the denial of constitutional rights or state action that is preempted by federal law is, as a matter of law, threatened with irreparable harm.  Moreover, the State's argument severely minimizes the actual damage being done here.  Although the State has argued that at this juncture it is only planning to stop the federal funding it would otherwise pass through to Exodus and the other local agencies, there is absolutely no limiting principle that would prevent the State from interfering tomorrow with the federal funding that it receives to be paid to the refugees themselves.  This would be disastrous to both the refugees and Exodus. However, even if the only federal funds that the State chooses to withhold are the grant moneys to Exodus, this will

---

[20]        Although it is unnecessary to go further, it is clear that even if elevated scrutiny is not applied here that the classification that the State has made between Syrian refugees and non-Syrian refugees fails to meet the requirement that "under like circumstances and conditions, people must be treated alike, unless there is a rational reason for treating them differently." *LaBella Winnetka v. Vill. of Winnetka*, 628 F.3d 937, 941 (7th Cir, 2010) (internal quotation and citation omitted). There simply is no reason to believe that the extensively vetted Syrian refugees who will be placed in Indiana are any different than the other extensively vetted refugees. It is not rational to treat them, and the agencies that serve them, differently. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-50 (1985).

[33]

have a significant financial consequence. One of these grants is for more than $900,000 in 2016. (ECF No. 16-1 at 9).  Of the 890 refugees that Exodus anticipates this year, the 215 refugees from North East / South Asia will consist largely of refugees from Syria. (ECF No. 16-1 ¶ 8). Therefore, Exodus will sustain a significant financial hit that will, of necessity cause "severe negative repercussions on its ability to provide for the families it serves." (*Id.* ¶ 44).[21]  The harm is not just the loss of  money suffered by Exodus, but the inevitable harm that this will cause to the refugee population it serves. This harm cannot be cured by a future damages award.

The State's suggestion is that Exodus could just determine not to accept Syrian refugees and it is insisting on doing so at this point "only to score political points." (Defs. Mem at 45). However, the State does not counter the fact that what it is urging is for Exodus to violate its agreements with its Voluntary Agencies and to contravene its mission—to serve all refugees, (ECF No. 16-1 ¶¶ 48-49).  As Exodus has previously demonstrated, case law is clear that frustration of organizational purpose is irreparable harm. (ECF No. 16 at 26 n.8).  The harm that Exodus faces cannot be undone by any future monetary award.  It is irreparable.

## B.      The balance of harms and the public interest favor an injunction

The State makes a number of arguments, all erroneous, to support its claims that the balance of harms favor it here.  It repeats the argument that it needs to prevent dangerous Syrian refugees from coming to Indiana.  However, it is not preventing Syrian refugees from coming to Indiana.  It is instead denying necessary assistance to agencies for their assistance when they do arrive, which they will. The State argues further that it is attempting to force "a more meaningful state-federal discussion over refugee-related security matters" by fomenting a "high-stakes

---

[21]      The State suggests that "Exodus is looking into receiving direct reimbursement from the federal government. (Ex. MM, Varga Dep. 119)." (Defs. Mem. at 46).  The deposition excerpt cited by the State simply does not support this claim.  Moreover, a search to try to compensate for the loss of funding does not demonstrate that the search will be successful and also supports the fact that this money is essential.

policy negotiation between the State and the United States." (Defs. Mem. at 48).[22]  Of course, the "high-stakes" here are assumed by Exodus and its clients who will all be harmed by the State's actions.  The State does not attempt to demonstrate how its actions will affect the United States and remedy the harm that the State perceives itself to be suffering.

While the State attempts to put a federalism gloss on its argument, its policy is intended to do harm—to Exodus and the other refugee resettlement agencies in Indiana and to the refugees served by them.[23] And, it will do harm absent an injunction.  On the other hand, the State's and the public's interest will not be harmed by an injunction here. Indeed, a preliminary injunction will serve the ultimate public interest in enforcing obedience to the rule of law.

## CONCLUSION

The humanitarian crisis posed by Syrian refugees is immense and tragic. Indiana's response is misguided and hurtful and it belies the notion of "Hoosier Hospitality." Regardless, what the State is doing is unlawful and unconstitutional. The requirements for the grant of a preliminary injunction are met and the State must be enjoined from interfering in any way with the federal monies owed to Exodus for serving Syrian refugees or owed to the refugees directly.

---

[22]     The State notes that it is "not satisfied" that the United States has "consulte[ed] regularly (not less often than quarterly) with State and local governments and private voluntary agencies concerning the sponsorship process and the intended distribution of refugees." 8 U.S.C. § 1522(a)(2)(A).  The State does not explain how punishing Exodus and injuring the agency and its refugee-clients further this purpose, even assuming that this is a legitimate purpose.

[23]     The State argues that  "unless a refugee has family in a particular state, the Voluntary Agencies who decide where to send refugees seem to make those decisions based on monetary considerations as much as anything else." (Defs. Mem. at 49).  However, the record cited by the state only indicates that on occasion a case without relative ties will be moved to another agency to maintain its projected numbers. (ECF No. 41-39, dep. pp.62-63). The point being made here by the State is not clear given that it is Exodus that is a plaintiff and that it and its clients are being punished here, not the Voluntary Agencies, and given that the Voluntary Agencies will shift cases around to maintain numbers, this merely assures the fact that Exodus will be receiving the number of Syrian refugees it has projected.

s/ Kenneth J. Falk

Kenneth J. Falk
No. 6777-49

s/ Gavin M. Rose

Gavin M. Rose
No. 26565-53

s/ Jan P. Mensz

Jan P. Mensz
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN  46202
317-635-4059
Fax: 317-635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org


Judy Rabinovitz
*Pro Hac Vice*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
212-549-2618
fax: 212-549-2654
jrabinovitz@aclu.org

Omar Jadwat
*Pro Hac Vice*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street
New York, NY 10004
212-549-2620
fax: 212-549-2654
ojadwat@aclu.org

Cecillia Wang
*Pro Hac Vice*
AMERICAN CIVIL LIBERTIES

[36]

UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
415-343-0775
fax: 415-395-0950
cwang@aclu.org

Attorneys for Plaintiff


<u>Certificate of Service</u>

I hereby certify that on this 29th day of January, 2016, a copy of the foregoing was filed electronically with the Clerk of this Court. A copy will be served by the Court's system on

Thomas M. Fisher
Solicitor General
Office of the Attorney General
tom.fisher@atg.in.gov

Patricia O. Erdmann
Chief Counsel for Litigation
Office of the Attorney General
patricia.erdmann@atg.in.gov


<u>s/ Kenneth J. Falk</u>
Kenneth J. Falk
Attorney at Law