**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| EXODUS REFUGEE IMMIGRATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:15-cv-01858-TWP-DKL |
| ) | |
| MIKE PENCE in his official capacity as ) | |
| Governor of the State of Indiana, ) | |
| JOHN WERNERT in his official capacity as ) | |
| the Secretary of the Indiana Family and Social ) | |
| Services Administration, ) | |
| ) | |
| Defendants. ) | |

**<u>ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

This matter is before the Court on a Motion for Preliminary Injunction filed pursuant to

Federal Rule of Civil Procedure 65(a) by Plaintiff Exodus Refugee Immigration, Inc. ("Exodus").

(Filing No. 6.)  In late 2015, Indiana Governor Mike Pence ("Governor Pence") directed Indiana

state agencies to not pay federal grant funds to local refugee resettlement agencies, such as Exodus,

for social services these agencies provide to the Syrian refugees they help resettle in Indiana.

Governor Pence asserts that he issued this directive to deter the national resettlement organizations

from placing Syrian refugees in Indiana.  Shortly thereafter, Exodus filed its Complaint against

defendants Governor Pence and John Wernert, the Secretary of the Indiana Family and Social

Services Administration, (collectively, the "State"), asserting that the State's action was preempted

by federal law and discriminated against Syrians in violation of the Equal Protection Clause of the

Fourteenth Amendment and Title VI of the Civil Rights Act of 1964.

Exodus seeks to enjoin the State's action pending the resolution of this case.  The parties

submitted evidence, and the Court held a hearing on Exodus's motion.  For the reasons that follow,

Exodus has demonstrated that it is likely to succeed on the merits of its equal protection claim. The State's conduct clearly discriminates against Syrian refugees based on their national origin. Although the State says it has a compelling reason for doing so—the safety of Indiana residents— the withholding of federal grant funds from Exodus that it would use to provide social services to Syrian refugees in no way furthers the State's asserted interest in the safety of Indiana residents. Exodus has also made the other showings necessary to be entitled to preliminary injunctive relief. Accordingly, Exodus's motion for a preliminary injunction is **GRANTED**.  ([Filing No. 6](#)).

## I.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right.  In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "To obtain a preliminary injunction, a party must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest." *Grace Schools v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015); *see Winter*, 555 U.S. at 20.  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted).  "Stated another way, the district court 'sit[s] as would a

2

chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

## II.   BACKGROUND

### A.   The Resettlement of Refugees in the United States and Indiana

The Refugee Act of 1980, which amended the Immigration and Nationality Act, sets forth the policies and procedures that govern the resettlement of refugees from other countries in the United States.  *See* 8 U.S.C. § 1157, *et seq.*  For purposes of federal law, the term "refugee" is defined as:

> Any person who is outside any country of such person's nationality… and who is unable or unwilling to return to, or is unable and unwilling to avail himself or herself of the protection of, that country because of persecution or well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1158(b)(1).  The number of refugees accepted by the United States is determined by the President each year as "justified by humanitarian concerns or is otherwise in the national interest." 8 U.S.C. § 1157(a)(2).  The President has determined that up to 85,000 refugees shall be admitted to the United States in 2016, at least 10,000 of whom will be Syrian.

The Refugee Act created the Office of Refugee Resettlement ("ORR") within the Department of Health and Human Services to fund and administer the federal programs related to the resettlement of refugees in the United States.  *See* 8 U.S.C. § 1521.  Additionally, within the Department of State, the Bureau of Population, Refugees, and Migration ("PRM") is responsible for determining which refugees are eligible for resettlement.  PRM funds and manages nine Resettlement Support Centers ("RSCs") around the world, which are operated by international nongovernmental organizations.  The RSCs prepare applications for refugees seeking resettlement in the United States.  This process includes the collection of information from the refugees, security

3

screenings at the direction of the Department of State and the Department of Homeland Security, and health screenings.  The approval process for refugees through PRM usually takes eighteen to twenty-four months.

Refugees accepted for resettlement in the United States are placed into all fifty states through one of three mechanisms: (1) the voluntary adoption of a State Plan for the acceptance of refugees pursuant to the Refugee Act; (2) the Wilson-Fish program; or (3) a joint private-public partnership.  Indiana elected to proceed under the first option by adopting a State Plan for resettling refugees in Indiana.  To receive federal funds for the resettlement of refugees, the State Plan submitted to ORR must comply with the various requirements of the Refugee Act.  *See* 8 U.S.C. § 1522(a)(6)(A).  Indiana's refugee resettlement program is administered by the Indiana Family and Social Services Administration ("FSSA").

**B.      Exodus's Role in Resettling Refugees in Indiana**

Exodus, an Indiana non-profit corporation, is one of three local resettlement agencies in Indiana that is dedicated to assisting refugees who are selected for resettlement in Indiana.  Its organizational mission is to "work with refugees—worldwide victims of persecution, injustice, and war—to establish self-sufficient lives in freedom and sanctuary for themselves and their families." (Filing No. 16-1 at 2).  Once a refugee has been approved for resettlement by the federal government, national organizations known as Voluntary Agencies provide reception and placement services.  After a Voluntary Agency accepts a refugee for resettlement from PRM, it notifies an affiliated local resettlement agency, such as Exodus, that it will be receiving the refugee for local resettlement.  Exodus has cooperative agreements with two Voluntary Agencies to resettle refugees in Indiana.

Upon receiving a notification of resettlement from a Voluntary Agency, Exodus uses federal funds directly from PRM to perform the work necessary to prepare for the refugees' arrival, such as obtaining and furnishing a place for the refugees to live.  Once the refugees arrive, however, Exodus receives federal funds passed through the states—specifically, in Indiana, through FSSA.  Exodus uses these federal grant funds to provide employment services to refugees, as well as to pay Exodus staff and administrative costs.

In accordance with its State Plan, Indiana utilizes grants from the federal government— often by passing them on to other entities such as Exodus—to ensure that refugees receive the following services: (1) social services provided by local resettlement agencies, such as cultural integration training, job skills training, and adult English language training; (2) temporary cash assistance paid directly to refugees actively seeking employment; (3) medical assistance for initial health screenings and medical treatment provided by local county health departments and resettlement agencies; (4) existing benefits programs such as Medicaid and the supplemental nutrition assistance program ("SNAP"); and (5) school assistance funds paid to the Indiana Department of Education for schools providing English language instruction to refugee children.

## C.     The State's Directive and Its Impact

In August 2015, Exodus was notified that a refugee family from Syria had been approved for placement in Indiana, and Exodus was assigned to assist the family with resettlement.  Exodus therefore expended time and resources to prepare for this family's arrival, such as securing adequate housing.

Shortly before the family arrived, Governor Pence, on November 16, 2015, declared that he was suspending the resettlement of Syrian refugees in Indiana.  Specifically, he publicly stated that:

5

> [i]n the wake of the horrific attacks in Paris, effective immediately, I am directing all state agencies to suspend the resettlement of additional Syrian refugees in the state of Indiana pending assurances from the federal government that proper security measures have been achieved.  Indiana has a long tradition of opening our arms and homes to refugees from around the world but, as governor, my first responsibility is to ensure the safety and security of all Hoosiers.  Unless and until the state of Indiana receives assurances that proper security measures are in place, this policy will remain in full force and effect.

Governor Mike Pence, *Governor Pence Suspends Resettlement of Syrian Refugees in Indiana*, *at* http://www.in.gov/activecalendar/EventList.aspx?view=EventDetails&eventidn=239126&information_id=233816&type&syndicate=syndicate (last visited, Feb. 25, 2016).  The following day, the FSSA notified Exodus of this decision, and asked Exodus to inform "the national resettlement agency that the scheduled placement for the Syrian family scheduled to arrive this Thursday, November 19, and all subsequent Syrian arrivals be suspended or redirected to another state." (Filing No. 16-1 at 46).  The Syrian family scheduled to arrive, which was in route to Indiana, was diverted to Connecticut where they have been resettled.

Despite the State's directive, Exodus continues to resettle Syrian refugees in Indiana.  In January 2016, Exodus resettled a family of four Syrian refugees in Indiana.  Overall, Exodus is projected to receive 890 refugees in the 2016 fiscal year.  Of these refugees, 215 are projected to be from "North East / South Asia," and this number will largely be made up of Syrian refugees. (Filing No. 16-1 at 2).  Exodus remains committed to resettling these Syrian refugees in Indiana, and the Voluntary Agencies have informed Exodus that Syrians will continue to be assigned to Exodus for resettlement in Indiana regardless of the State's directive.

The specifics of the State's directive have been clarified during the course of this litigation.  It now acknowledges that "no one claims that Indiana has authority to close its own borders . . . to Syrians."  (Filing No. 64 at 4) (citations, alternations, and quotation marks omitted).  Therefore, contrary to Governor Pence's public statement, the State is not preventing Syrian refugees from

resettling in Indiana; indeed, as stated above, Exodus and other local resettlement agencies have resettled Syrian refugees in Indiana since the State's directive.  Instead, the State will not pay federal grant money to local resettlement agencies, such as Exodus, to reimburse them for social services they provide to Syrian refugees they assist resettling in Indiana.  Specifically, Exodus will not receive reimbursement for social services such as cultural integration training, job skills training, and adult English language training.[1]

The State will, however, continue to provide medical assistance, school assistance, and cash assistance to Syrian refugees if they otherwise qualify, including but not limited to Temporary Cash Assistance for Needy Families, SNAP, and Medicaid benefits.  The State also provides Syrian refugees certain employment and training services via a contract with a separate entity.  Such services, however, are not the same as the social services provided by Exodus, and as such, are not an adequate substitute for the employment and language training Exodus's clients' need.

Furthermore, certain refugees are eligible for a federal Matching Grant Program.  This program provides employment training to refugees through funds directly from the federal government.  The four Syrian refugees Exodus has already resettled in Indiana are participating in the Matching Grant Program, but it is Exodus's policy to not simultaneously provide them with the employment training for which Exodus would need State reimbursement.  The Matching Grant Program lasts one-hundred-and-eighty days, after which refugees remain eligible for further employment training using the federal grant funds offered through the State.  Because of Governor Pence's directive, Exodus will not seek reimbursement for social services from the State for the four Syrian refugees currently enrolled in the Matching Grant Program.  However, Exodus is

---

[1] In order to receive reimbursement for these services, "resettlement agencies each month must submit to FSSA[] itemized claims for services rendered to all refugees in the prior month."  (Filing No. 41-6 at 2).

currently providing social services to other Syrian refugees it serves through the federal grant funding passed through the State, rather than via the Matching Grant Program.

The State's decision to not pass on federal funds to reimburse Exodus for social services it provides will have significant repercussions on Exodus's ability to serve the refugees families to whom it is assigned.  To make up for this lost money, Exodus will have to take away services it provides in other areas, which will strain its ability to serve not only its Syrian clients, but all of its clients.  This, says Exodus, will jeopardize its organizational mission to serve all refugees, and it will also potentially cause Exodus to breach its agreements with Voluntary Agencies that place refugees with Exodus.

The state of Indiana continues to welcome refugees from other countries around the world, including Iraq, Iran, and Afghanistan.  The directive applies only to Syrian refugees.

## III.   DISCUSSION

To obtain a preliminary injunction, Exodus "must establish [1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that issuing an injunction is in the public interest."  *Grace Schools*, 801 F.3d at 795.  The Court will address each of these four factors in turn.[2]

### A.    Likelihood of Success on the Merits

Exodus challenges the State's directive on three grounds: (1) it is preempted by federal law; (2) it constitutes impermissible discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) it constitutes impermissible discrimination in violation of Title

---

[2] The United States filed a Statement of Interest in this case pursuant to 28 U.S.C. § 517.  Its statement addresses only the merits of Exodus's equal protection claim, and it agrees with Exodus that the State's conduct violates the Equal Protection Clause.  Where appropriate, the Court will reference arguments made by the United States.

VI of the Civil Rights Act of 1964. The parties' arguments with respect to Exodus's likelihood of success on these claims follow several distinct paths. First, the State raises several procedural barriers to reaching the merits of Exodus's claims; specifically, it challenges whether a cause of action exists that permits private enforcement of Exodus's preemption claims, and it contends that Exodus does not have standing to raise any of its claims. Second, the parties dispute whether, if Exodus can overcome these procedural hurdles, it is likely to succeed on the merits of its claims. In the end, the Court concludes that Exodus has standing to bring its equal protection claim and that it is likely to succeed on its merits, thus the Court need not ultimately resolve Exodus's Title VI or preemption claims. Before turning to Exodus's equal protection claim, a discussion of Exodus's preemption claims are warranted.

Without delving into the details of Exodus's preemption claims, a cursory review of Exodus's conflict preemption claim reveals that it too is likely to succeed on the merits. As an initial matter, contrary to the State's position, the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), does not demonstrate that the Refugee Act precludes the Court from exercising its equitable power to enjoin unlawful executive action, as neither of the two requisite factors in that case are met here. First, there is no withholding of funds provision in the Refugee Act, as there was in § 30A of the Medicaid Act. *See* 8 U.S.C. § 1522(a)(7)-(8). Second, unlike the "broad" provision at issue in *Armstrong* that created an open-ended standard for state Medicaid plan payments to be calculated, the provision at issue in the Refugee Act here is a straight forward anti-discrimination provision. *See* 8 U.S.C. § 1522(a)(5) ("Assistance and services funded under this section shall be provided to refugees without regard to race, religion, nationality, sex, or political opinion."). Far from unadministrable, federal courts routinely enforce similar anti-discrimination provisions.

As to the merits, conflict preemption occurs where the state action "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 578 (7th Cir. 2012).  For reasons similar to those discussed below regarding Exodus's equal protection claim, the State's withholding of federal funds for social services provided to Syrian refugees is diametrically opposed to Congress's goal of providing services to refugees "without regard to . . . nationality."  8 U.S.C. § 1522(a)(5).  Accordingly, a cursory review of Exodus's conflict preemption claim reveals that it too is likely meritorious.

Nevertheless, the Court ultimately resolves the likelihood of success on the merits factor on Exodus's discrimination claims.  Exodus's equal protection and Title VI claims are both predicated on its view that the State's conduct amounts to national origin discrimination in that the State passes on federal funds to Exodus for the social services it provides to its refugee clients except those from Syria.  These claims are coextensive, given that Title VI "'proscribes[s] only those racial classifications that would violate the Equal Protection Clause.'"  *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (quoting *Regents v. Bakke*, 438 U.S. 265, 287 (1978)); *see Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 697 (7th Cir. 2015) ("Racial discrimination by a recipient of federal funds that violates the Equal Protection Clause also violates Title VI.").  The Court will therefore address only Exodus's equal protection claim.  The Court's analysis will begin with whether Exodus has standing to bring this claim and, concluding that it does, will turn next to its merits.

### 1.    Standing

Exodus contends that it has Article III standing because it was injured by the State's conduct, and further, that it has third-party prudential standing to bring an equal protection claim

on behalf of its Syrian refugee clients who are subject to national origin discrimination by the State.  The Court will address each of these distinct standing doctrines in turn.

### a.   Article III Standing

"From Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies'," and the separation-of-powers principles underlying that limitation, [the Supreme Court] ha[s] deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  This constitutional minimum, often referred to as Article III standing, is jurisdictional.  *See Dunnet Bay*, 799 F.3d at 688.  To establish Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citation and quotation marks omitted).

Exodus argues that it has Article III standing because (1) it has been injured, and will continue to be injured, by failing to receive reimbursement from the State for social services it provides its Syrian refugee clients; (2) this injury was directly caused by the State's directive; and (3) the injury will be redressed by a favorable decision.  More specifically, Exodus presents evidence that the State's decision to not reimburse Exodus will have significant repercussions on Exodus's ability to serve the refugee families to whom it is assigned and that, to make up for this lost money, Exodus will have to take away services it provides in other areas to both its Syrian and non-Syrian refugee clients.  (*See* Filing No. 16-1 at 7.)

11

The State does not directly dispute whether Exodus has Article III standing, and it even acknowledges that its conduct "may harm Exodus's economic interests." (Filing No. 41 at 54.) The State does, however, raise one argument regarding prudential standing that touches upon the Court's Article III standing—namely, that there is no injury, or that it is at least hypothetical, because it is unclear whether any Syrian refugees will be assigned to Exodus for resettlement in Indiana.

Although the State argues that Exodus's injury is speculative because it is unclear whether Exodus will be assigned any Syrian refugees for resettlement, the evidence reveals the contrary. First and foremost, Exodus is already providing social services to Syrian refugees.[3]  Moreover, Exodus has been informed by two Volunteer Agencies that it has been assigned to resettle nineteen Syrian refugees "in the next few weeks or months." (Filing No. 16-1 at 6.)  The State attempts to undermine this evidence by pointing out that sometimes these assignments are changed before resettlement occurs; indeed, the nineteen Syrian refugees originally scheduled for resettlement has been reduced to fifteen.  (Filing No. 41-39 at 17.)  But even if only fifteen, rather than nineteen, Syrian refugees are scheduled for resettlement in the near future, this is still sufficient injury in fact.  Moreover, the State has not undermined Exodus's evidence that it is projected to resettle 215 refugees from "North East / South Asia" in 2016, most of whom will be Syrian.  (Filing No. 16-1 at 2.)  The loss of funds for social services Exodus provides its Syrian refugee clients, and will provide in the near future, is an injury to Exodus that is "imminent" rather than "speculative." *Silha*, 807 F.3d at 173.

---

[3] Because Exodus is currently providing Syrian refugees—other than the four refugees resettled in January 2016—social services for which it can seek reimbursement from the FSSA, it is irrelevant that those four refugees are enrolled in the Matching Grant Program and that Exodus will therefore not seek reimbursement for them from the State.

In conclusion, the Court agrees with Exodus that the evidence demonstrates it has Article III standing to bring its equal protection claim.  The evidence adduced by Exodus shows that it will be economically harmed by the State's decision to withhold federal funds from Exodus for social services it provides to its Syrian clients.  This loss of federal funds is detrimental to the programming Exodus can provide to its clients.

### b.    Prudential Standing

The parties vigorously dispute whether Exodus has prudential standing to bring its equal protection claim.  Prudential standing is a "nonconstitutional doctrine, entirely judge-made," which "precludes the federal courts from exercising jurisdiction over some types of case that Article III would not forbid the courts to adjudicate."  *MainStreet Organization of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2005); *see Dunnet Bay*, 799 F.3d at 689 ("In contrast with constitutional limitations on standing, prudential limitations are not jurisdictional and may be disregarded in certain situations.").  This "salutary rule of self-restraint [was] designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative."  *Craig v. Boren*, 429 U.S. 190, 193 (1976).

The prudential standing doctrine is somewhat in tension with the Supreme Court's recent "reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is 'virtually unflagging.'"  *Lexmark*, 134 S. Ct. at 1386 (quoting *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)).  Nevertheless, the Supreme Court continues to apply the prudential standing doctrine, which "encompass[es] . . . at least three broad principles: the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected

by the law invoked." *Id.* The prudential limitation at issue here, referred to as third-party standing, is the first of these principles—namely, "that a litigant generally must assert his own legal rights and interests and cannot assert the legal rights or interests of third parties." *Dunnet Bay*, 799 F.3d at 689. The third-party standing doctrine "'recognizes that claims are best prosecuted by those who actually have been injured, rather than by someone in their stead.'" *Marin-Garcia v. Holder*, 647 F.3d 666, 670 (7th Cir. 2011) (quoting *Massey v. Wheeler*, 221 F.3d 1030, 1035 (7th Cir. 2000)).

"Like any general rule, however, this one should not be applied where its underlying justifications are absent." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). Therefore, the Supreme Court "has looked primarily to two factual elements to determine whether the rule should apply in a particular case." *Id.*; *see Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). First, the Supreme Court looks to:

> the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit.

*Singleton*, 428 U.S. at 114-15. Part of this analysis includes an examination of whether "the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 115. Second, the Court must examine "the ability of the third party to assert his own right." *Id.* at 115-16.

The State contends that neither of the two factual elements are met here because, as to Syrian refugees that Exodus may resettle in Indiana in the future, "Exodus does not now and may never have relationships with them." (Filing No. 41 at 53.) Further, the State argues that even if

14

a sufficient relationship exists between Exodus and its future Syrian refugee clients, there is no reason that those individuals cannot bring suit to vindicate their own rights.

Exodus responds that its interests and those of its Syrian refugee clients are closely linked and not at all speculative, as it has produced undisputed evidence that it is already providing social services to Syrian refugees that it has resettled in Indiana, and further, that it will be resettling additional Syrian refugees in Indiana in the very near future and throughout the year.  Moreover, Exodus contends that there are real impediments to Exodus's Syrian refugee clients bringing this suit—namely, that many have limited English-language proficiency and they have a "natural-desire to 'lay low,'" particularly "given that public knowledge of the family's origin may very well provoke the type of fears of terrorist activity noted by the Governor in this case."  (Filing No. 46 at 35.)  Beyond these criteria, Exodus argues that courts have consistently found that a business or organization has standing to raise claims "on behalf of its customers or clients when the challenged actions restrict the clients and thereby injure the business."  (Filing No. 46 at 35.)

The Court agrees with Exodus that the two factual predicates for third-party standing are present in this case.  First, Exodus certainly has a close relationship with its Syrian refugee clients. Its entire purpose and mission is to resettle refugees escaping dire circumstances so that they may establish "self-sufficient lives in freedom and sanctuary for themselves and their families in Indiana."  (Filing No. 16-1 at 2.)  To do so, Exodus uses federal grant funds to provide its clients an entire range of services, including social, medical, and employment.  Exodus seeks to assert its Syrian refugee clients' equal protection rights so that it may continue to receive federal funding to provide social services to those clients, which the State is currently withholding only as to refugees from Syria.

This demonstrates that the enjoyment of the Syrian refugee's equal protection rights "is inextricably bound up with the activity [Exodus] wishes to pursue." *Singleton*, 428 U.S. at 114. Put differently, Exodus wishes to receive the funding necessary to provide social services to its Syrian clients, but it is being prevented from doing so by conduct it contends violates those clients' rights under the Equal Protection Clause to not be subject to national origin discrimination. Therefore, the Court's "construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id.* at 114-15.

The State's argument to the contrary—that Exodus currently has no ongoing relationship with any Syrian refugee clients, and it is uncertain that it ever will—is unsupported by the evidence. As discussed above, Exodus is already providing reimbursable social services to Syrian clients that it previously resettled in Indiana, and it has been assigned to resettle fifteen Syrian refugees in Indiana "in the next few weeks or months." (Filing No. 16-1 at 6.) Exodus undoubtedly has a sufficiently close relationship with these refugees.

These facts distinguish this case from those holding that a sufficiently close relationship did not exist because, for example, the attorney-client relationship invoked regarded future, undetermined clients and was thus "hypothetical" rather than "existing," *Kowalski*, 543 U.S. at 131, or the doctor-patient privilege had ended and would never resume, *see Massey v. Helman*, 196 F.3d 727, 741 (7th Cir. 1999). Unlike in those cases, Exodus has a current, ongoing relationship with specific Syrian refugees it has resettled, or will soon resettle, in Indiana. Given this, and the singularity of interests between Exodus and its Syrian refugee clients, it is clear that Exodus is "fully, or very nearly, as effective a proponent of the right" as its clients. *Singleton*, 428 U.S. at 115.

The second factor that must be evaluated—the ability of Syrian refugees to assert their rights—also favors third-party standing.   This factor presents a relatively low threshold. Hindrances to litigation need not be "insurmountable," *Singleton*, 428 U.S. at 117; it is sufficient that there is merely "*some* hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (emphasis added).

It is clear that Syrian refugees have significant hindrances to bringing this suit on their own. For starters, as Exodus argues, they are newly arrived refugees, escaping political or religious persecution, who quite understandably have a desire to "lay-low" and not draw the attention to themselves that this suit would necessarily bring.   This desire is particularly salient given the attention Syrian refugees generally are receiving from government officials and the media, as the parties' evidence readily demonstrates.[4]   Moreover, Governor Pence publicly stated that he was suspending the resettlement of Syrian refugees in the State.   Although this ultimately did not occur, it is fair to say that Syrian refugees would be reticent to bring this litigation against the Governor in such circumstances.

The foregoing hindrances to bringing this litigation are similar in quality to other hindrances courts have found sufficient to confer third-party standing.   *See Powers*, 499 U.S. at 414-15 (holding that the lack of incentive for jurors excluded from a trial to vindicate their constitutional rights was a sufficient hindrance to warrant third-party standing); *Singleton*, 428 U.S. at 117 (holding that physicians have third-party standing to assert the right of their patients who seek abortions because those women "may be chilled from [an] assertion [of their own rights] by a desire to protect the very privacy of her decision from the publicity of a court suit");

---

[4] This includes coverage of ongoing litigation between other states and the federal government regarding the resettlement of Syrian refugees in those states.   *See, e.g.*, *Alabama v. United States*, No. 2:16-cv-00029-JEO (N.D. Ala. 2015); *Texas Health & Human Servs. Commission v. United States*, No. 3:15-cv-03851-N (N.D. Tex. 2015).

*Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (holding that third-party standing was present for an organization to bring claims on behalf of individuals receiving mental health services because the "stigma associated with receiving mental health services presents a considerable deterrent to litigation"). Moreover, even if the foregoing hindrances to bringing this litigation were relatively minor, "when the interests of the litigant and the third party are closely related," as they undoubtedly are here, "courts have viewed quite charitably assertions of third-party standing." *Rothner v. City of Chicago*, 929 F.2d 297, 301 (7th Cir. 1991).

For these reasons, the two factors necessary to confer third-party standing upon Exodus in this case are met. Notably, this conclusion is in accord with several cases in which the Supreme Court "has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (collecting cases). For example, in *Craig*, the Supreme Court held that an alcohol vender had third-party standing to bring a constitutional challenge to a statute governing the sale of beer to males on behalf of its male customers. 429 U.S. at 194. Specifically, it concluded that these "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* at 195. As in these cases, the enforcement of the State's directive against Exodus—declining to reimburse it for social services it provides only to Syrian refugees—indirectly results in the alleged violation of the Syrian refugees' constitutional rights.

Finally, the Court's conclusion that Exodus has third-party standing accords with the notion that the prudential limitation on third-party standing "should not be applied where its underlying justifications are absent." *Singleton*, 428 U.S. at 114. As stated above, a primary purpose of the

doctrine is "to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig*, 429 U.S. at 193.  Here, however, the contours of the constitutional question are clear: the Court must assess whether it violates the Equal Protection Clause for the State to withhold federal funds from Exodus that it uses to provide social services to Syrian refugees.

Accordingly, Exodus has third-party standing to assert the equal protection rights of its Syrian refugee clients in this case.  Not only are the two factual elements necessary to establish third-party standing present, but allowing Exodus to pursue this claim in no way undermines the justifications animating the prudential limit on third-party standing.

### 2.    Merits

"The Equal Protection Clause of the Fourteenth Amendment protects individuals from governmental discrimination." *Swanson v. City of Chetek*, 719 F.3d 780, 783 (7th Cir. 2013).   If the governmental discrimination at issue "classifies by race, alienage, or national origin, [the Court] subject[s] the legislative action to strict scrutiny." *Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006); *see Swanson*, 719 F.3d at 783 ("The typical equal protection case involves discrimination by race, national origin or sex.").  If the governmental conduct does not "involve a suspect classification, rational-basis review applies." *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015).

The parties first dispute what level of scrutiny should apply to the State's conduct.  The Court will address this question first, before assessing whether the challenged conduct withstands the proper scrutiny.

### a.   Applicable Level of Scrutiny

Exodus and the United States both contend that the State's directive discriminates on the basis of national origin and therefore must be subject to strict scrutiny.[5]  The State responds that national origin discrimination, for the purposes of the Equal Protection Clause, is a proxy for discrimination based on race or ethnicity, which are characteristics its directive does not take into account.

The State points to cases in which the term national origin is discussed in terms of ethnicity or ancestry.  *See, e.g.*, *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 93 (1973) (interpreting the term "national origin" in Title VI of the Civil Rights Act, and discussing the term as it relates to ancestry, but not United States citizenship or alienage).  But as Exodus points out, the Supreme Court—in the equal protection context—has equated national origin discrimination to discrimination based on one's nationality.  *See Graham v. Richardson*, 403 U.S. 365, 371 (1965) ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *see also Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984) (listing "nationality" as a suspect class subject to strict scrutiny).  The State's argument, therefore, that national origin discrimination does not include discrimination based on nationality is directly contrary to the Supreme Court's statement in *Graham* and cases following it.  Moreover, the Supreme Court has held that classifications based on "country of origin" are subject to strict scrutiny, and in so doing discussed "country of origin" in term of both ancestry and nationality. *Oyama v. California*, 332 U.S. 633, 640 (1948) (holding that discrimination "based solely on . . . country of origin" requires a "compelling justification" to overcome an equal protection challenge).

---

[5] Exodus also argues that the State discriminates on the basis of alienage.  Because the Court ultimately concludes that strict scrutiny applies because the State discriminates on the basis of national origin, it need not address alienage.

The foregoing shows that, whether framed as ancestry, nationality, citizenship, or country of origin, national origin discrimination encompasses classifications based on where a person is from or based on specific characteristics that reflect as much.  The fact that the Supreme Court uses different terms when discussing national origin discrimination reflects not, as the State argues, that national origin discrimination includes only discrimination based on one of these discrete categories; it instead reflects that such classifications are examples of ways in which national origin discrimination occurs.

Here, the State's directive, which singles out refugees of Syrian citizenship or those of no citizenship who last resided in Syria, can fairly be described as a classification based on nationality. But regardless of the precise word used to describe the State's classification, the State's own characterization of it removes any doubt that it discriminates based on national origin.  The State's directive applies to "any refugee who is fleeing Syria," which is determined "by reference to the refugee's country of origin, *i.e.*, the country of the refugee's citizenship or residence whose protection from persecution the refugee is unable or unwilling to seek."  (Filing No. 41-1 at 2-3) (citing 8 U.S.C. § 1101(a)(42)(A)).  The State's argument based on this definition is essentially that it classifies based on a refugee's "country of origin," not its national origin.  When stated as such, it seems patent that this is a distinction without a difference, as these terms are one in the same.  This is especially true given that the Supreme Court has used "national origin," "nationality," and "country of origin" interchangeably when describing classifications subject to strict scrutiny.  *See Graham*, 403 U.S. at 371; *Oyama*, 332 U.S. at 640.

Finally, even if the State can find a way to parse those terms such that they are not completely overlapping—e.g., "country of origin" includes Syrian citizens *and* non-Syrian citizens who reside in Syria, while national origin includes only Syrian citizens or those of Syrian

descent—the State provides no explanation for why such a distinction matters for the purposes of equal protection analysis.  Although the Supreme Court has not settled on a definitive test for whether a certain classification is subject to heightened scrutiny, it has looked to certain criteria, such as whether the characteristic defining the class is "immutable," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), and whether the class is politically powerless or has been subjected to a history of discrimination, *see Massachusetts Bd. of Retirement v. Muriga*, 427 U.S. 307, 314 (1976).  For the State's argument to carry any weight, these factors would have to apply more strongly, for example, to a classification based on citizenship or ancestry than to individuals whose "country of origin," as defined by the State, is Syria, such that the former group would constitute a protected class while the latter would not.  The State has not explained how this is so, nor is it clear how it could.

In the end, the State tries to complicate a question that is rather straightforward.  It is treating refugees who originate from Syria differently than those from other countries.  If this is not national origin discrimination, the Court does not know what is.

### b.      Application of Strict Scrutiny

As stated above, classifications based on national origin are subject to strict scrutiny. *Vision Church*, 468 F.3d at 1000.  To survive strict scrutiny, the challenged action "must be narrowly tailored to serve a compelling governmental interest."  *Northern Contracting, Inc. v. Illinois*, 473 F.3d 715, 720 (7th Cir. 2007); *see Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 720 (2007).

The State suggests that it has a compelling interest in protecting Indiana residents from the threat of terrorism posed by refugees fleeing Syria.  It presents evidence in the form of, among other things, Congressional reports and testimony from governmental officials regarding the

22

potential threat posed by individuals seeking to commit acts of terrorism in the United States who pose as Syrian refugees.  For example, the Assistant Director of the FBI's Counterterrorism Division, Michael Steinback, testified before Congress that a concern with conducting background checks for Syrian refugees is "the lack of our footprint on the ground in Syria, [and] that the databases won't have the information we need."  (Filing No. 41-18 at 50.)  And Director of the FBI, James Comey, testified regarding background checks for Syrian refugees, stating that the United States "could only query what [it] ha[s] collected," but that the United States has far less in its databases with respect to Syrian refugees than Iraqi refugees.  (Filing No. 41-19 at 1.)

Exodus presented countervailing evidence.  For example, Exodus submitted the declaration from former Secretary of Homeland Security Janet Napolitano, who attests that all refugees "who have been admitted to the United States have passed through the highest levels of scrutiny from a law enforcement and national security perspective," and that these checks take approximately eighteen to twenty-four months to complete.  (Filing No. 46-1 at 1.)

The parties each assert a series of evidentiary challenges to the others' declarations.  The Court need not delve into these challenges, however, because the Court will assume without deciding that the State has a compelling interest in the safety and security of Indiana citizens.[6] This is because, even if this asserted interest is compelling, the State's response is not "narrowly tailored to serve [that] compelling governmental interest."  *Northern Contracting*, 473 F.3d at 720.

The State argues that its withholding of federal grant monies for Syrian refugees is narrowly tailored because it is a "measured response meant to deter, temporarily, resettlement of

---

[6] The Court notes that it doubtful that the State has carried its burden to "specifically identify an 'actual problem' in need of solving." *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011).  For the most part, the States' evidence is highly generalized and speculative.  There is no evidence, for example, that would allow the Court to conclude that any of the specific Syrian refugees being resettled in Indiana by Exodus create a heightened risk of terrorist activities.  Nevertheless, the Court will *assume* that this showing has been made.  This assumption, as such, should not be viewed in any way as a factual determination that Syrian refugees resettled in Indiana pose any particular level of security risk.

Syrian refugees in Indiana, and to prompt more thoroughgoing engagement between the federal government and the states." (Filing No. 41 at 57.)  More specifically, the State asserts that its directive "is not intended to deter potentially dangerous refugees from wanting to resettle in Indiana; it is aimed at deterring the *resettlement agencies* from bringing potentially dangerous refugees to Indiana." (Filing No. 64 at 10.)

Exodus responds that a narrowly tailored response to the State's purported compelling interest in safety would be to "do something to investigate individuals that prompt this suspicion, rather than create a blanket policy" meant to deter resettlement of all Syrian refugees in Indiana. (Filing No. 46 at 41.)  The United States agrees with Exodus's position, arguing that the withholding of funding for social services for Syrian refugees fails to "advance any interest in public safety," and instead merely harms those refugees without justification. (Filing No. 58 at 19.)

The State's attempt to further its asserted compelling interest in public safety by withholding federal funds for social services provided to Syrian refugees is a far cry from a means "specifically and narrowly framed to accomplish that purpose." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003).  As an initial matter, the record shows that the State's attempt to deter Voluntary Agencies from resettling Syrian refugees in Indiana has been utterly ineffective: several Syrian refugees have been resettled in Indiana since the State's directive, including by Exodus, and the Voluntary Agencies with which Exodus works have informed Exodus that they will continue to assign Syrian refugees to Exodus for resettlement in Indiana.  It is difficult to see how a response could ever be narrowly tailored to achieve a goal when the only evidence before the Court on the matter reveals that the means chosen have not in any way advanced the goal; Syrian refugees have, and will continue to be, resettled in Indiana despite the directive.

24

But the fact that the State's purported attempt at deterrence is not at all working is merely one reason why the State's directive is not narrowly tailored.  The purpose of the narrow tailoring requirement "is to ensure that the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype."  *Id.* (citation and quotation marks omitted).  The withholding of funds from Exodus that are meant to provide social services to Syrian refugees in no way directly, or even indirectly, promotes the safety of Indiana citizens.  The State's position to the contrary rests upon assumptions about which the evidence is, at best, unclear; specifically, that the withholding of these funds will deter Voluntary Agencies from resettling Syrian refugees here (which, as stated above, the evidence demonstrates is false) and that the specific Syrian refugees who are not resettled here because of that deterrence would pose a security risk (about which the State can only speculate).

Even if the State's desired deterrence was actually created, it would deter Voluntary Agencies from settling *all* Syrian refugees in Indiana, not just those who supposedly pose a security risk.  For example, based upon evidence regarding Syrian refugees who have been or soon will be resettled in Indiana, this includes Syrian children as young as four years old.  It is beyond reasonable argument to contend that a policy that purportedly deters four year olds from resettling in Indiana is narrowly tailored to serve the State's asserted interest in public safety.  Simply put, the State's directive, even if it was effective, is dramatically over-inclusive and thus not narrowly tailored.

Related to the foregoing problems is the focus of the State's directive.  The State deprives Syrian refugees that are already in Indiana of social services in the hopes that it will deter Voluntary Agencies from resettling *other* Syrian refugees in the State.  This is essentially a policy of punishing Syrian refugees already in Indiana in the hopes that no more will come.  As stated

above, such a course does nothing to alleviate the alleged threat caused by the Syrian refugees that are already in Indiana, who, assuming they pose a security risk (which has not been proved), by their mere presence would pose a much greater one than Syrian refugees who have not yet settled here.  It is difficult to see how a narrowly tailored response could include only the deterrence of future security risks, without at all addressing present ones.

The State implicitly confronts this problem by arguing that its method of deterrence is the State's only option given its limited authority to act in the immigration arena, but that does not mean its response is narrowly tailored.  There is no requirement that every governmental classification can be sufficiently narrowly tailored such that it will overcome strict scrutiny.  After all, the Supreme Court has observed that governmental conduct is "rarely . . . sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984).

To the extent the State argues that the fact that its directive is "temporary" helps show that it is narrowly tailored, the Court disagrees.  The State has unsurprisingly cited no legal authority for the proposition that temporary national origin discrimination is any more constitutionally acceptable than permanent discrimination.  Moreover, when questioned at the hearing about the purported temporary nature of the State's directive, the State was unable to give even a loose timeframe for when the directive may change.

In sum, the evidence before the Court reveals that the means the State has chosen to accomplish its objectives do not at all further the State's asserted interest in safety.  And even if there was evidence that the State's directive created the desired deterrence on Voluntary Agencies from settling Syrian refugees here, this falls well short of the "specifically and narrowly framed," *Grutter*, 539 U.S. at 333, response the law requires to overcome strict scrutiny. The State's directive is entirely unresponsive to the Syrians already here, and sweeps too broadly with the

Syrian refugees it seeks to deter from coming.  Therefore, the State's objective and the means it has employed to accomplish that objective fail to fit "so closely that there is little or no possibility that the motive for the classification was illegitimate . . . ." *Id.*

Having failed to survive strict scrutiny by a wide margin, there is a strong likelihood that the State's withholding of federal funds that Exodus uses to provide Syrian refugees with social services violates the Equal Protection Clause.  Notably, the Court would reach the same conclusion even if the State's directive should be subject to rational-basis review instead of strict scrutiny. Applying rational-basis review, Exodus has shown that the State's "difference in treatment is not rationally related to a legitimate state interest." *Cook*, 808 F.3d at 322.  For the reasons stated, the State's legitimate interest in safety has in no way been furthered by its treatment of Syrian refugees differently than others.  Syrian refugees continue to be resettled in Indiana, and there is no evidence that the State's goal of deterrence has had any effect.  Accordingly, Exodus has a strong likelihood of success on the merits regardless of the level of scrutiny applied to the State's directive.

**B.    Irreparable Harm**

The Court, having determined that Exodus has a strong likelihood of success on its equal protection claim, must address the remaining preliminary injunction factors, beginning with irreparable harm.  To prove this factor, Exodus must show "that it is likely to suffer irreparable harm in the absence of preliminary relief." *Grace Schools*, 801 F.3d at 795.

Exodus argues that it has demonstrated irreparable harm for two reasons.  First, Exodus contends that constitutional violations are presumed to cause irreparable harm.  Notably, the State does not respond to this argument.  Second, Exodus argues that the failure to receive the funding to which it is entitled will frustrate its organizational mission, as Exodus cannot afford to compensate for the money lost without severe damage to its ability to provide for the refugee

families it serves.  The Court need not address Exodus's second argument, as the first is sufficient for Exodus to carry its burden to establish irreparable harm.

Exodus is correct that "for some kinds of constitutional violations, irreparable harm is presumed."  *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).  The Seventh Circuit has explicitly held that this presumption applies when one's First or Second Amendment rights are violated.  *See id.*  Several judges in this district, including the undersigned, have concluded that this presumption also applies to equal protection violations.  *See, e.g.*, *Baskin v. Bogan*, 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014); *Planned Parenthood of Indiana and Kentucky v. Commissioner, Indiana State Dep't of Health*, 984 F. Supp. 2d 912, 930 (S.D. Ind. 2013); *L.P. v. Commissioner, Indiana State Dep't of Health*, 2011 WL 255807, *4 (S.D. Ind. 2011).

The same conclusion is warranted here, as the basis for holding that violations of one's First and Second Amendment rights constitute irreparable harm apply equally to equal protection violations.  As explained by the Seventh Circuit, "[t]he loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future."  *Ezell*, 651 F.3d at 699.  The same is true of the loss of Second Amendment rights, which "protect[] similarly intangible and unquantifiable interests."  *Id.*  If the Second Amendment right to possess a firearm for protection is "intangible and unquantifiable," certainly the right to not be subject to unconstitutional discrimination by the government is as well.  *Cf. Back v. Carter*, 933 F. Supp. 738, 754 (N.D. Ind. 1996) ("[E]qual protection rights are so fundamental to our society that any violation of those rights causes irreparable harm.").

Moreover, when the Seventh Circuit has concluded that a constitutional violation does not cause irreparable harm, it is because the violation can be rectified by an award of damages.  For example, a Fourth Amendment violation stemming from an illegal search or seizure does not presumptively cause irreparable harm because it is a "constitutional tort" analogous to a "personal-injury" claim where money damages will be awarded.  *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004).  Unlike Fourth Amendment violations that are akin to personal injury claims, the harm from unconstitutional discrimination is "intangible and unquantifiable," as governmental discrimination has consequences well beyond those that money could ever rectify.

Even if irreparable harm was not presumed, Exodus has still carried its burden on this factor.  Although the funding denied to Exodus could ultimately be reimbursed, Exodus has presented evidence that, in the interim, its organizational objectives would be irreparably damaged by its inability to provide adequate social services to its clients.  This, in the alternative, provides another basis to conclude that Exodus has made the necessary showing on this fact.

In sum, Exodus has shown a strong likelihood of success that the State's challenged conduct constitutes unconstitutional discrimination in violation of the Equal Protection Clause.  Such an ongoing constitutional violation constitutes irreparable harm.  *See Preston v. Thompson,* 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.").

## C.    Balance of Harms

The third preliminary injunction factor requires Exodus to demonstrate "that the balance of equities tips in its favor."  *Grace Schools*, 801 F.3d at 795.  "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the

29

more it must weigh in his favor."  *Turnell*, 796 F.3d at 662.  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller*, 695 F.3d at 678 (citation and internal quotation marks omitted).

Exodus's position regarding the balance of harms is straightforward:  Exodus will suffer irreparable harm as well as financial and organizational harm, and the State, as a governmental entity, cannot claim that being required to comply with the Constitution is harmful.  The State addresses the balance of harms and the public interest factors together, and focuses almost entirely on the public interest factor.  To the extent the State addresses the balance of harms, it contends that Exodus is not suffering organizational harm, as it is continuing to resettle Syrians in Indiana, and Exodus nor its clients are suffering financial harm because, as is the case for the four Syrian refugees Exodus resettled in January 2016, the Matching Grant Program functions as an alternative source for any funds Exodus may lose.

As an initial matter, Exodus has made a strong showing that it is likely to succeed on the merits of its equal protection claim.  Therefore, the balance of harms need not strongly weigh in Exodus's favor for this factor to be met.  Exodus has certainly met this relatively low threshold. Exodus has demonstrated irreparable harm for the reasons discussed above.  Further, Exodus has presented evidence that the State's withholding of federal funds from Exodus will have significant repercussions on Exodus's ability to serve the refugee families to whom it is assigned.  It will cause Exodus to forgo services it provides to refugees in other areas, which will strain its ability to serve not only its Syrian refugees, but all its refugee clients.

The State's attempts to downplay these harms are unavailing.  First, as to financial harm, the State essentially argues that there is none since Exodus can simply utilize the Matching Grant

Program.  But the preliminary injunction Exodus seeks is about more than the four Syrian refugees resettled in January 2016; it is also about the nearly two-hundred Syrian refugees it will settle here in 2016.  "Injunctions issue to curtail palpable risks of future injury; it is not essential to establish that the worst has come to pass."  *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006).  Exodus therefore need not wait until the State denies reimbursement for social services it provides utilizing the federal grant funds that pass through the FSSA.  It is undisputed that Exodus will resettle Syrian refugees here in the imminent future that are eligible to receive social services using these funds, and, as the Court has concluded, it is likely that the denial of these funds by the State violates the Equal Protection Clause.  There is a "palpable risk[] of future injury" to Exodus, and that is all the showing that is required.  *Id.*

Second, as to organizational harm, this stems from Exodus's inability to provide all of the services it believes necessary to adequately transition its clients to life in Indiana.  The fact that Exodus continues to resettle Syrians here does not diminish the harm the impending financial consequences of the State's directive places on Exodus's ability to fulfill its organizational mission.

The State has presented essentially no evidence that granting Exodus a preliminary injunction will cause countervailing harms.  This is perhaps because it is difficult to conceive of how an injunction requiring it to comply with the Constitution could be harmful.  *See Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) ("[I]f [a state university] is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the state university's] claimed harm is no harm at all.").  To the extent the State contends that the potential harm stems from the risk Syrian refugees purportedly pose to the safety of Indiana residents, as discussed at length above, the State's withholding of funds for social services to Syrian refugees

does not directly or indirectly address this concern. Syrian refugees have been and will continue to be resettled in Indiana despite the State's directive, which shows that, even if the purported safety risks were a legitimate harm, whether or not the State continues to pass on federal money to Exodus for social services it provides Syrian refugees does not implicate that concern.

The State also suggests that refugees have no particular stake in settling in Indiana, thus neither Exodus nor any refugees will be harmed if the State's directive remains in place. Presumably, this argument is premised on the fact that Voluntary Agencies will not assign Syrian refugees to Exodus for resettlement in Indiana, since it is those agencies, not the refugees, that determine where refugees will be resettled. The evidence reveals that this premise is false. But even if the Voluntary Agencies were deterred from resettling Syrian refugees in Indiana because the State's conduct has a detrimental effect on the social services Exodus could provide its refugees, such a state of affairs would directly harm Exodus's organizational mission to assist in the resettlement of any and all refugees.

The most notable feature of the State's position in this case is that it says its directive is justified because it is meant to deter the resettlement of Syrian refugees in Indiana by harming Exodus's ability to provide those refugees with social services. Yet at the same time the State argues there is no harm to Exodus or its refugee clients. The State cannot have it both ways.

The only way the State could conceivably have it both ways is if the Voluntary Agencies decide to not settle *any* Syrian refugees in Indiana through Exodus. But, again, the evidence shows that this has not occurred, nor will it in the future.

In sum, Exodus, and the refugees it serves, will suffer real harm absent a preliminary injunction in this case, and the State will suffer none. Accordingly, Exodus has shown that the balance of harms weighs in its favor.

D.      **Public Interest**

The fourth and final preliminary injunction factor requires Exodus to show "that issuing an injunction is in the public interest." *Grace Schools*, 801 F.3d at 795.  Exodus argues that it is always in the public interest for the State to follow federal law, especially when there are no adequate remedies available.

The State responds that the federal government is violating its responsibility under the Refugee Act to "consult regularly" with Indiana and take its views into consideration before placing refugees in the state. *See* 8 U.S.C. § 1522(a)(2)(A), (D).  Therefore, the State says that its directive "is part of a larger effort not only to deter resettlement of Syrian refugees without better background checks, but also to persuade the United States to consult more seriously with the States." (Filing No. 41 at 63.)  In short, the States says it is in the public interest to allow the State to proceed with its course of action, as it is part of a "high-stakes policy negotiation between the State and the United States . . . , which weighs heavily against an injunction that would tie the Governor's hands." (Filing No. 41 at 63.)

Beginning with the State's position, the Court agrees with Exodus that, "even assuming that [the State's goal of forcing the federal government into a policy negotiation] is a legitimate purpose," the State "does not explain how punishing Exodus and injuring its refugee-clients further this purpose." (Filing No. 46 at 44 n.22.)  The State essentially argues that it is in the public interest for the Court to allow unconstitutional discrimination to continue during the pendency of this litigation—discrimination that harms both Exodus and its clients—so that it can gain perceived leverage in its dispute with the federal government over immigration policy and whether the federal government is complying with its obligations under the Refugee Act.

The Court could hardly disagree more with the State's position.   The public interest is served when constitutional rights are vindicated.   *See Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest.") (quoting *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).   This does not change simply because the State believes a non-party is failing to comply with federal law. Indeed, the Court has difficulty seeing how a party (the State) could ever demonstrate that it was not in the public interest to enjoin an ongoing constitutional violation because that party wished to use the conduct causing the constitutional violation as leverage in a dispute with a non-party (the United States).   But regardless of whether this would ever be appropriate, the State has certainly not demonstrated that it is here.

Accordingly, the public interest is served by enjoining ongoing unconstitutional discrimination by the State against Syrian refugees who are resettling in Indiana.   *See Preston*, 589 F.2d at 303 n.3 ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

## IV.   <u>CONCLUSION</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right.   In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."   *Winter*, 555 U.S. at 20.   Exodus has demonstrated that it is likely to succeed on the merits of its equal protection claim.   The State's conduct clearly constitutes national origin discrimination.   Although the State says it has a compelling reason for doing so—the safety of Indiana residents—the withholding of federal funds from Exodus that it would use to provide social services (such as cultural integration training, job skills training and adult English language training) to Syrian refugees in no way furthers the State's

34

asserted interest in the safety of Indiana residents.  In balancing the competing claims of injury, it is clear that Exodus and its refugee clients will be harmed by the State's directive.  When this is weighed against the near complete absence of harm to the State, it is clear that equity demands a preliminary injunction to issue.

Accordingly, Exodus's Motion for Preliminary Injunction is **GRANTED**.  (Filing No. 6.) Pursuant to Federal Rule of Civil Procedure 65(d), the Court **ISSUES A PRELIMINARY INJUNCTION** prohibiting the State from taking any actions to interfere with or attempt to deter the resettlement of Syrian refugees by Exodus in the State of Indiana, including by withholding from Exodus funds and services due Exodus and the refugees it serves.  Because the State has not disputed Exodus's position that the State will not incur monetary damages from this injunction, Exodus need not post a bond.

Date: 2/29/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Judy Rabinovitz
ACLU FOUNDATION
jrabinovitz@aclu.org

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Cecillia D. Wang
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
cwang@aclu.org

Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
ojadwat@aclu.org

Jefferson S. Garn
INDIANA ATTORNEY GENERAL
Jefferson.Garn@atg.in.gov

Jonathan R. Sichtermann
INDIANA ATTORNEY GENERAL
jonathan.sichtermann@atg.in.gov

Lara K. Langeneckert
INDIANA ATTORNEY GENERAL
lara.langeneckert@atg.in.gov

Heather Hagan McVeigh
OFFICE OF THE ATTORNEY GENERAL
heather.mcveigh@atg.in.gov

Patricia Orloff Erdmann
OFFICE OF THE ATTORNEY GENERAL
Patricia.Erdmann@atg.in.gov

Thomas M. Fisher
OFFICE OF THE ATTORNEY GENERAL
tom.fisher@atg.in.gov

James C. Luh
U.S. DEPARTMENT OF JUSTICE
james.luh@usdoj.gov