**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| EXODUS REFUGEE IMMIGRATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:15-cv-01858-TWP-DKL |
| ) | |
| MIKE PENCE in his official capacity as ) | |
| Governor of the State of Indiana, and ) | |
| JOHN WERNERT in his official capacity as ) | |
| the Secretary of the Indiana Family and Social ) | |
| Services Administration, ) | |
| ) | |
| Defendants. ) | |

**ORDER DENYING DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

This matter is before the Court on a Motion for Stay Pending Appeal pursuant to Federal Rule of Civil Procedure 62(c) by Defendants Governor Mike Pence and John Wernert, the Secretary of the Indiana Family and Social Services Administration (collectively, "the State"). (Filing No. 74.) On February 29, 2016, the Court granted Plaintiff Exodus Refugee Immigration, Inc. ("Exodus") a preliminary injunction. The State has appealed that decision and seeks with its current motion a stay pending the resolution of its appeal. The legal standards governing whether a stay should be granted are the same as those governing whether a preliminary injunction should be granted in the first instance. Therefore, as explained in more detail below, essentially the same reasons justifying a preliminary injunction also justify declining to stay that injunction pending appeal. Accordingly, the State's Motion for Stay Pending Appeal is **DENIED**.

## I. LEGAL STANDARD

"The standard for granting a stay pending appeal mirrors that for granting a preliminary injunction." *In re A&F Enters., Inc.*, 742 F.3d 763, 766 (7th Cir. 2014). "To determine whether

to grant a stay, [the court] consider[s] the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other." *Id.*  "As with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *Id.* The purpose of a stay pending appeal "is to minimize the costs of error." *Id.*

## II.     BACKGROUND

The Court incorporates by reference the background facts set forth in the Order Granting Plaintiff's Motion for Preliminary Injunction (the "Preliminary Injunction Order"). (*See* [Filing No. 70 at 3-8.](#)) On February 29, 2016, the Court issued its Preliminary Injunction Order, which enjoined the State "from taking any actions to interfere with or attempt to deter the resettlement of Syrian refugees by Exodus in the State of Indiana, including by withholding from Exodus funds and services due Exodus and the refugees it serves." ([Filing No. 70 at 35](#)).  Shortly thereafter, the State filed a Notice of Appeal, notifying the Court that it is appealing the Preliminary Injunction Order.  Contemporaneously, the State filed the instant motion for a stay pending appeal.  Exodus has filed a response and the motion is now ripe for ruling.

## III.     DISCUSSION

In discussing the factors relevant to whether a stay pending appeal is appropriate, the parties first address the State's likelihood of success on the merits of its appeal, and then they address together the irreparable harm, balance of harms, and public interest factors.  The Court's analysis will therefore proceed in the same manner.

A.      **Likelihood of Success on Appeal**

In the Preliminary Injunction Order, the Court held that Exodus has a strong likelihood of success on its Equal Protection Clause claim. First, the Court held that the State's withholding of funds from Exodus for social services it provides its Syrian refugee clients constitutes national origin discrimination because, simply put, "it is treating refugees who originate from Syria differently than those from other countries," and therefore the State's directive is subject to strict scrutiny. (Filing No. 70 at 22.) The State's asserted compelling interest in treating Syrian refugees differently is its goal of protecting Indiana residents from potential terrorist who might pose as refugees fleeing Syria.

Without deciding, the Court assumed that the State's asserted interest was compelling, but held that the State's directive—the withholding of funds from Exodus that it used to provide social services to its Syrian refugees clients for the purpose of deterring the resettlement of Syrian refugees in Indiana—was not narrowly tailored to serve that interest. Specifically, the Court noted several factors, each of which independently demonstrated that the narrow tailoring requirement was not met: (1) Syrian refugees have been and will continue to be resettled in Indiana despite the State's directive, thus the State's directive in no way furthers its stated goal[1]; (2) even if the desired deterrence was created, such deterrence is dramatically over-inclusive in that it deters *all* Syrian refugees from resettlement, including children as young as four years old, not just those who purportedly pose a security risk; and (3) the State's deprivation of social services to Syrian refugees in Indiana amounts to punishing Syrian refugees who are already here in the hopes that it will deter

---

[1] Because the Voluntary Agencies have informed Exodus that they will continue assigning it Syrian refugees for resettlement, and Exodus remains committed to, and is, resettling its Syrian refugee clients in Indiana, Syrian refugees will continue to be resettled in Indiana. (*See* Filing No. 70 at 6.) Further, although Governor Pence initially stated that he was suspending the resettlement of Syrian refugees in Indiana, the State is not attempting to physically prevent Syrians from resettling in Indiana and has since acknowledged that Indiana does not have the authority to close its own borders to Syrians. (*See* Filing No. 64 at 4.)

3

others from coming, and "[i]t is difficult to see how a narrowly tailored response could include only the deterrence of future security risks, without at all addressing present ones." (Filing No. 70 at 26.) In sum, the Court concluded that the withholding of funding from Exodus that it would use to provide social services to Syrian refugees does "not at all further the State's asserted interest in safety," as Syrian refugees have and will continue to resettle in Indiana despite the State's directive and depriving these refugees of social services is entirely unrelated to any perceived security risk they pose. (Filing No. 70 at 26-27.)

Despite these rationale, the State argues that it is likely to succeed on appeal for two reasons. First, the State says its directive does not constitute national origin discrimination because it applies to all refugees coming from the geographic location of Syria, rather than to individuals of Syrian ancestry or ethnicity, and thus should only be subject to rational basis review. Second, even if strict scrutiny is proper, the State argues that its directive passes muster because although it has not deterred the resettlement of Syrian refugees yet, it will in the future when Exodus eventually runs out of short-term solutions to its funding problems. In any event, says the State, its directive is as narrowly tailored as possible because the security risk about which the State is concerned is created by "the fact that *anyone* fleeing Syrian could be a terrorist posing as a refugee," and thus it must deter this entire category of people from resettling in Indiana. (Filing No. 74 at 11.)

Turning first to whether the State's directive constitutes national origin discrimination, the Court addressed and rejected the State's position in its Preliminary Injunction Order. (*See* Filing No. 70 at 20-22.) For these same reasons, the State is unlikely to succeed on this point on appeal. As the Court explained, the Supreme Court has used various terms and categories when analyzing national origin discrimination—for example, ancestry, nationality, and country of origin—but the

4

variety in terms "reflects that such classifications are examples of ways in which national origin discrimination occurs," rather than, as the State argues, the narrow categories that constitute national origin discrimination. (Filing No. 70 at 20-21 (citing *Graham v. Richardson*, 403 U.S. 365, 371 (1965); *Oyama v. California*, 332 U.S. 633, 640 (1948))). This undermines the State's attempt to define national origin discrimination with such precision that cleverly delineated state action can evade strict scrutiny simply if it discriminates based on the geographic location from where a person originates, rather than their ancestry or citizenship. Undoubtedly these categories are in large part overlapping, and thus it would undermine the protections of the Equal Protection Clause to subject the latter categories to strict scrutiny but not the former. This is likely why the State has again cited no legal authority supporting its finely parsed definition of national origin discrimination.

The Court also concludes that the State is unlikely to successfully show on appeal that its directive survives strict scrutiny. Each of the three reasons summarized above and discussed at length in the Court's Preliminary Injunction Order is alone sufficient to conclude that the State's directive is not narrowly tailored. The State speculates that its goal of deterring the resettlement of Syrian refugees in Indiana will eventually work as Exodus's ability to overcome the financial harm to it erodes. (*See* Filing No. 74 at 10.) Whether this is true or not is unclear at this time; but the evidence presented to the Court for the purposes of the preliminary injunction motion revealed that, despite the State's directive, the Voluntary Agencies intend to continue assigning Syrian refugees to Exodus and that Exodus has and will continue to accept them. The State notes that it is attempting to deter the resettlement agencies, such as Exodus, rather than the national Voluntary Agencies from resettling Syrian refugees in Indiana. This distinction is irrelevant to the Court's preliminary injunction ruling and the instant motion. Both Voluntary Agencies and Exodus are

5

involved in the resettlement decision and both have and will continue to resettle Syrian refugees in Indiana. Therefore, the first reason noted in the Preliminary Injunction Order—that Syrian refugees have been and will continue to be resettled in Indiana despite the State's directive, thus the State has entirely failed to further its stated goal—remains true.

But even if the State's directive eventually created the desired deterrence, the Court's other two bases for concluding that the directive was not narrowly tailored would still preclude the directive from surviving strict scrutiny. The State asserts that it is not its intent to punish Syrian refugees that are already here in hopes that it will deter others from coming. But regardless of its intent, that is precisely what it is doing. Therefore, the State has not meaningfully confronted, let alone undermined, the Court's conclusion that a narrowly tailored response cannot "include only the deterrence of future security risks, without at all addressing present ones." ([Filing No. 70 at 26](#).)

Finally, the State has also failed to undermine the Court's conclusion that its directive is dramatically over-inclusive in that it attempts to deter *all* Syrian refugees from resettling in Indiana, including children as young as four years old, not just ones who are perceived to be a security risk. The State argues that the fact "[t]hat the directive would apply to 'Syrian children as young as four years old' is not evidence of over-inclusiveness, but merely recognition that small children will be accompanied by parents or other adults who *do* fall into the category of refugees who pose a security risk." ([Filing No. 74 at 11](#).) But even if described as a "recognition" that four-year old children will be deterred from resettling in Indiana because they will be accompanied by an adult that the State contends may be dangerous, that is a recognition that the State's directive is over-inclusive—that is, it deters the resettlement of Syrians that *everyone* agrees do not pose a security risk. Simply because the State argues that its directive represents the narrowest tailoring

6

possible given its limited authority to act in the immigration arena does not mean that the narrow tailoring requirement is met; as the Court noted in the Preliminary Injunction Order, there is no requirement that every classification based on national origin has an avenue available to survive strict scrutiny.  (*See* Filing No. 70 at 26.)

In sum, the Court concludes that the State has a low likelihood of success on appeal regarding the merits of Exodus's equal protection claim.  Any chance it has is significantly lowered by the several alternative bases for the Court's decision, each of which would be sufficient to uphold this aspect of the preliminary injunction ruling.  Regarding the equal protection claim, the Court concluded that Exodus will likely succeed on that claim even if the State's directive is only subject to rational basis review.  (*See* Filing No. 70 at 27.)  Moreover, although the Court provided only a brief discussion of Exodus's conflict preemption claim, it concluded that it was likely to succeed on that claim as well.  (*See* Filing No. 70 at 9-10.)  Given all of the alternative ways in which Exodus is likely to succeed on the merits, the State's likelihood of success on the merits of its appeal are low.

**B.     Harm to the Parties and Public Interest**

Having determined that the State has a small chance of success on appeal, it must make a strong showing that the balance of harms weighs in its favor to warrant a stay pending appeal. *See In re A&F Enters.*, 742 F.3d at 766 ("As with a motion for a preliminary injunction, a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa.").  The State attempts to do so by assailing several of the Court's conclusions in the Preliminary Injunction Order, but none of the State's attempts to do so are availing.  The Court will address each in turn and, in the end,

conclude that for essentially the same reasons set forth in the Preliminary Injunction Order, the State has failed to make the showing necessary to be entitled to a stay pending appeal.

Turning first to irreparable harm, in granting Exodus a preliminary injunction, the Court determined that Exodus would suffer irreparable harm in the absence of an injunction both because irreparable harm is presumed for equal protection violations, and because the evidence revealed that Exodus's organizational objective to provide social services to all of its refugee clients would be irreparably harmed. (*See* Filing No. 70 at 28-29 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *Baskin v. Bogan*, 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014))). Here, the State attempts to undermine the former reason by arguing that the presumption of irreparable harm "in effect, writes the other requirements out of the preliminary injunction standard." (Filing No. 74 at 5.) But that is not an argument for not applying the presumption when the law states it is applicable, as the Court concluded it does. Notably, despite the specific analysis provided by the Court for applying the presumption in this case in the Preliminary Injunction Order, the State does not suggest that this analysis was flawed or that the rationale in *Ezell* is inapplicable to this case.

As to the balance of harms, the Court concluded that the State provided "essentially no evidence" that it would be harmed by a preliminary injunction. (Filing No. 70 at 31.) The State argued that it would be harmed by its inability to adequately address its safety concerns regarding Syrian refugees. But the State's ability to do so was not at all impacted by the preliminary injunction, nor would it be by denying a stay pending appeal. As noted in the Preliminary Injunction Order, "Syrian refugees have been and will continue to be resettled in Indiana despite the State's directive, which shows that, even if the purported safety risks were a legitimate harm, whether or not the State continues to pass on federal money to Exodus for social services it provides Syrian refugees does not implicate that concern." (Filing No. 70 at 32.)

8

The State's attempt to undermine the Court's reasoning on this point—both in its preliminary injunction briefing and again regarding the instant motion—is revealing. The State argues that, notwithstanding the Governor's directive, the fact that "Exodus has continued to resettle Syrian refugees in Indiana and is using matching grant funds from a different federal government program to provide services to these refugees" shows that Exodus suffers "comparatively little harm" because its organizational mission has not been in any way diminished or thwarted. ([Filing No. 74 at 4-5](#).) As Exodus rightly points out, and as the Court concluded in its Preliminary Injunction Order, such an argument is mutually exclusive with the State's position regarding the merits of the equal protection claim. Specifically, the State

> says its directive is justified because it is meant to deter the resettlement of Syrian refugees in Indiana by harming Exodus's ability to provide those refugees with social services. Yet at the same time the State argues there is no harm to Exodus or its refugee clients. The State cannot have it both ways.

([Filing No. 70 at 32](#)).

Perhaps more importantly, the evidence reveals that the State cannot have it either way. Clearly, any attempt at deterrence has failed because Exodus continues to resettle Syrian refugees in Indiana. But this does not mean that Exodus and its clients are not being harmed. The Court found in its Preliminary Injunction Order that Exodus presented sufficient evidence to prove that the withholding of funds will significantly undermine the social services it can provide to its clients. (*See, e.g.*, [Filing No. 70 at 8](#).) Thus, while it is true that this harm has not deterred the Voluntary Agencies or Exodus from resettling Syrians in Indiana, it is only true because they have refused to acquiesce to what Exodus believes is unconstitutional discrimination, not because there is no harm being done.

As to the State's argument about Exodus's use of a separate federal matching grant program to provide the services at issue to its clients, it is noticeably vague with respect to the

details of the program. Exodus, however, fills in the details, and they reveal that the federal matching grant program does not alleviate all of the harm caused by the State's directive. First, the matching grant program is only available to refugees who are not receiving other forms of cash assistance or Temporary Assistance for Needy Families ("TANF") benefits, and Exodus has presented undisputed evidence that it serves and will continue to serve refugees receiving TANF benefits. Second, Exodus points out that the matching grant program is just that—it requires Exodus to expend resources that will then be matched.

Therefore, the State has done nothing to undermine the Court's conclusion that the State's conduct harms Exodus and its clients. Exodus presented undisputed evidence that the State's directive will require it to shift its resources to make up for the funding it will lose, and this will have a detrimental effect on its Syrian and non-Syrian clients' resettlement and transition to life in the United States. The State, on the other hand, will not be harmed if its motion for stay pending appeal is denied, as its withholding of funds for social services provided to Syrian refugees in no way impacts the alleged safety and security concerns those refugees pose.

Turning finally to the public interest factor, the Court concluded in the Preliminary Injunction Order that this factor also favored Exodus. As the Court noted, it is in the public interest to vindicate constitutional rights. ([Filing No. 70 at 34](#) (citing *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)). The State's main argument to the contrary—that an injunction would harm its ability to force the federal government to more seriously consult with Indiana regarding the resettlement of Syrian refugees—was and remains a non-starter. The Court noted that it had "difficultly seeing how a party (the State) could ever demonstrate that it was not in the public interest to enjoin an ongoing constitutional violation because that party wished to use the conduct causing the constitutional violation as leverage in a dispute with a non-party (the

United States),'' but that even if it could "the State ha[d] certainly not demonstrated that it is [in the public interest] here." (Filing No. 70 at 34.) The State has again not provided a basis for the Court to conclude otherwise. Therefore, this factor also favors denying the State's motion for stay pending appeal.

In sum, the Court held in the Preliminary Injunction Order that the irreparable harm, balance of harms, and public interest factors all favor granting Exodus a preliminary injunction. The State has not convinced the Court that these factors weigh differently for the purposes of the instant motion, and thus these factors also favor denying the State's request for a stay pending appeal.

## IV. CONCLUSION

For the reasons stated above, the State does not have a strong likelihood of success on appeal. Nor has the State shown that it will be harmed, irreparably or otherwise, by denying its motion for stay pending appeal. Exodus, however, would be harmed by granting the State's motion. Therefore, all of the relevant considerations favor denying the State's motion. Accordingly, the State's Motion for Stay Pending Appeal (Filing No. 74) is **DENIED**.

**SO ORDERED.**

Date: 03/29/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

11

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Omar C. Jadwat
ACLU FOUNDATION IMMIGRANTS' RIGHTS PROJECT
ojadwat@aclu.org

Judy Rabinovitz
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York  10004

Heather Hagan McVeigh
OFFICE OF THE INDIANA ATTORNEY GENERAL
heather.mcveigh@atg.in.gov

Jefferson S. Garn
OFFICE OF THE INDIANA ATTORNEY GENERAL
jefferson.garn@atg.in.gov

Jonathan R. Sichtermann
OFFICE OF THE INDIANA ATTORNEY GENERAL
jonathan.sichtermann@atg.in.gov

Patricia Orloff Erdmann
OFFICE OF THE INDIANA ATTORNEY GENERAL
patricia.erdmann@atg.in.gov

Thomas M. Fisher
OFFICE OF THE INDIANA ATTORNEY GENERAL
tom.fisher@atg.in.gov